The Adam Schantz, Sr., Corporation v. Commissioner.
The Adam Schantz v. Commissioner
Docket No. 30478.
United States Tax Court
1952 Tax Ct. Memo LEXIS 240; 11 T.C.M. (CCH) 424; T.C.M. (RIA) 52122; April 29, 1952
*240 Robert K. Landis, Esq., 11 W. Monument Bldg., Dayton, Ohio, and Robert K. Landis, Jr., Esq., for the petitioner. R. G. deQuevedo, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves deficiencies of $7,214.90, $2,673.22 and $890.05 in income taxes for the years 1945, 1946 and 1947, respectively. All of the issues raised by the petition were abandoned by the petitioner at the hearing except the question of whether gains realized by the petitioner in 1945 and 1946 from sales of improved real property are taxable as ordinary income or as capital gains. Petitioner filed his returns for the taxable years with the collector for the first district of Ohio. Findings of Fact The stipulated facts are so found. Adam Schantz, Sr. died testate in 1903, leaving ten children and a considerable estate to be held in trust for a specified time after the death of decedent's widow. After the death of the original trustee in 1921, the successor trustees did not acquire a great amount of additional property. Their policy was to pay off indebtedness of the estate out of earnings and proceeds of sale of corpus. In 1930 two of the beneficiaries *241 of the trust, each having a one-twelfth interest, became entitled to a distribution of their shares, and they elected to receive their interests. The trustees had the power of determining whether the other beneficiaries should receive distribution at that time or thereafter. They determined to continue the trust for another beneficiary holding a one-twelfth interest. In 1930 the estate consisted of improved downtown business property in Dayton, Ohio, one downtown parking lot, four pieces of improved suburban real estate, a vacant tract of suburban land, known as the "Schantz Plat," which had been platted into residential building lots, 2.17 acres of unplatted vacant land, known as "Hartzell Lands," and some investments. The trustees concluded that 1930 was not a good year to sell the property for distribution of the proceeds of sale to the beneficiaries. In June 1932, after the properties were appraised, the beneficiaries who were entitled to nine-twelfths of the estate organized petitioner to acquire their shares of the trust in exchange for stock. The Articles of Incorporation of petitioner contained the following clause: "To acquire by purchase or otherwise, hold, sell, assign, *242 transfer, mortgage, pledge, lease or otherwise dispose of real and personal property, and to manage the same; "And specifically to acquire the distributive interests of certain of the heirs of Adam Schantz, Sr., deceased, distributed to them in kind by the trustees of said estate, to manage and operate said properties, to dispose of the same from time to time as favorable opportunities may arise, and to distribute the available proceeds among those entitled to receive the same, to the end that an orderly and advantageous liquidation of the interests of said heirs may be accomplished as speedily as proper conservation of those interests will permit, and that pending such liquidation, said property interests may be properly safeguarded and managed. "And to do all things necessary and proper to carry out the foregoing purposes." The assets acquired by petitioner for its stock consisted of improved real estate of a total appraised value of $2,049,099.80 for purposes of settlement with non-stockholding beneficiaries, vacant lots of an appraised value of $234,609, and investments appraised at $327,844.45. The real estate, improved and unimproved, consisted of property known as "Central Block," *243 "Thomas Building," "Ludlow Building," in which petitioner had an 80 per cent undivided interest, "Denison Property," "Mercantile Building," "Mumma Property," in which petitioner had a 26 1/2 per cent undivided interest, "Dille Property," "Reeder Property," "Community Garage," "Double House," "Fourth and Wilkinson Property," "Hartzell Lands," "Drake Property," "Old Homestead" and "Schantz Park." The first eight properties consisted of improved business property in the downtown section of Dayton, Ohio, some parcels of which were in poor physical condition and required repairs and alterations. The Community Garage property was a two-level parking garage situated in a residential suburb of Dayton, Ohio. It was in poor condition when acquired by petitioner. Thereafter petitioner repaired and improved the property. The Double House consisted of two living units and was situated in a residential suburb of Dayton. It was in very poor condition when acquired by petitioner and required extensive repairs, which were made by petitioner. The Fourth and Wilkinson Property was a vacant tract in the downtown section of Dayton, Ohio, under lease to a parking lot operator. It required no repairs or *244 alterations. The Hartzell Lands have never been platted. A gasoline station was erected on part of the property and it has been rented since 1937. The Drake Property, consisting of 2.71 acres in a residential suburb of Dayton, was improved by a 70 year old brick farm house. The condition of the house was such that it was not habitable until after petitioner had made repairs and alterations. The Old Homestead property was in a residential section of Dayton and was improved by a large red brick house and a barn. Petitioner made considerable repairs to the property after 1932. Schantz Park consisted of about 35.1 acres of unimproved platted land situated in a residential suburb of Dayton, on which was located the homestead of the decedent, known as the Schantz Homestead. Petitioner constructed a house on the property. Petitioner had a full-time secretary, accountant, and building maintenance employees. From 1932 until 1941 it had a supervisor of buildings who had charge of a crew engaged in repairing and rehabilitating properties. The chairman of the board devoted all of his time to corporate affairs from 1930 until his death in December 1944. His duty was to negotiate profitable leases *245 on petitioner's rental property and consult with the lessees concerning their business affairs. Petitioner's president, working on a part-time basis, devoted most of his time for tax relief to owners of real estate. In addition to its own properties, petitioner, pursuant to a contract with coowners, had full management of the Ludlow Building and Mumma Property. Petitioner's first problem was to make repairs and alterations of property in poor physical condition, to rent unoccupied buildings and increase rentals in other property. Government bonds held by petitioner were sold to pay the cost of the work. Petitioner's policy on the downtown property was not to sell any parcel that was producing a good rate of return and creating a higher value. The downtown properties were advertised for rent. None of them ever had "For Sale" signs posted on them. Petitioner did not sell any of its improved property until the opportunity was favorable to it. The unimproved land was not incomeproducing property and taxes and maintenance charges were a drain on the finances of petitioner. The policy of petitioner was to sell lots on the land whenever possible. Signs were placed on the properties that lots *246 were for sale. A court order issued in 1926 prevented petitioner from paying commissions on sales. The restriction did not exist after petitioner acquired the land. From one-fourth to one-third of the Hartzell and Schantz lands were unsold at the close of 1946. Except for one house in Dayton, Ohio, which was acquired as part payment of part of the Hartzell Lands in 1944 and about 1,000 square feet in the rear of the Central Block property, which was purchased for use as a loading and unloading area for the convenience of tenants, petitioner has not purchased or acquired title to any other real property since it was organized. The aggregate amount of net rental income received from the properties, except the Drake Property and the Schantz Homestead, from 1933 through the years indicated, was as follows: Central Block [1]
$ 81,010.65
Thomas Bldg. [2]
95,008.30
Ludlow Bldg. [2]
120,436.66
Denison Property [2]
77,577.68
Mercantile Bldg. [2]
195,459.95
Mumma Property [2]
61,766.93
Dille Property [1]
10,404.23
Reeder Property [3]
4,979.11
Community Garage [3]
1,224.11
Double House[4] *247 7,785.94
Fourth and Wilkinson Property [5]
19,294.68
Gasoline station on Hartzell Lands [2]
7,041.33
A loss of $60,341.81 was sustained in the operation of the lands and subdivisions to the close of 1947. Petitioner and its officers and employees have not at any time since its organization held a real estate broker's license or a real estate salesman's license. During the fiscal year ending June 30, 1943 petitioner sustained losses totaling $4,315.68 on the sale of unimproved tracts and realized gains totaling $5,949.44 on sales of securities. The net gain of $1,633.76 on the transactions was reported as capital gain and taxed at 25 per cent. Thereafter petitioner filed an amended return and claimed a refund of $1,208.39 on the ground that the losses on the sales of unimproved land should not be treated as capital losses and that the amount of $4,315.68 should have been deducted from ordinary income. The claim was allowed and the refund was paid in accordance with petitioner's claim. During the fiscal year ending June 30, 1944 petitioner sold the Dille Property at a loss of $5,165.65, the Drake Property at a gain of $1,737.54, and the house erected in Schantz Park at a loss of $30.01. The sales of the Dille and Drake properties were made to the tenants who occupied *248 them at the request of the lessees themselves. In August 1944 the directors of petitioner adopted a resolution containing, among other things, the following: "* * * whereas this corporation was formed by certain heirs of Adam Schantz, Sr., Deceased, for the purpose of conserving and managing their distribution of interest in the property of said estate for their common advantage and also for the purpose of gradually liquidating said property as favorable opportunities arose and distributing the available proceeds thereof among those entitled to the same, * * *." In 1945 petitioner sold the Central Block, Reeder Property and Schantz Homestead at a gain of $41,710.27, $3,593.02 and $2,405.40, respectively, and the Community Garage at a loss of $4,989.54. In 1946 it sold the Double House at a gain of $9,567.53. The tenant of the Reeder Property was interested in purchasing the property from petitioner but required the capital for other needs of his business. Thereafter the tenant interested the owner of an adjacent building in the property and, after negotiations, petitioner sold the property to him. Petitioner's tenant continued to occupy the building after the sale as a tenant of the *249 new owner. In 1945 petitioner was being deluged by real estate operators for property to be listed with them for sale. While one of them was negotiating with petitioner, another agent, who handled real property leasing transactions for the principal tenant of the Central Bolck, became interested, and thereafter was instrumental in having one of his business associates make an offer for the property, which petitioner accepted. The Community Garage was never a financial success. In 1945 a real estate broker approached petitioner for a piece of property under $10,000 for sale to a client. Petitioner supplied the broker with figures on the garage and he interested his client in buying the property. The Schantz Homestead was purchased by the owner-occupant of adjoining land, as the result of a casual conversation at an informal meeting. The purchaser desired the property to round out his ownership of the adjacent land. The Double House was sold to the lessee of one of the units without any sales effort by petitioner. From 1933 through 1947 petitioner made sales of unimproved property as follows: Year ended
No. Sales
Loss
June 30, 1933 Lots
1
$ 67.58
June 30, 1936 Lots
9
3,651.72
June 30, 1937 Lots
10
6,856.05
June 30, 1938 Lots
2
933.71
June 30, 1939 Lots
10
5,456.75
June 30, 1940 Lots
20
12,327.50
June 30, 1941
6
11,956.66
June 30, 1943
4
4,315.68
June 30, 1944
1
132.38
Dec. 31, 1944
2
1,787.67
Dec. 31, 1945
7
9,863.37
Dec. 31, 1947
1
278.25
*250 In addition, the Fourth and Wilkinson Property was acquired by the U.S. Government for post office purposes during the fiscal year ending June 30, 1940, by condemnation proceedings, at a gain of $35,443.59 to petitioner. Other than sales of lots in Hartzell Lands and Schantz Park, this was the first sale made by petitioner. The sales through 1946 reduced petitioner's holdings of unimproved lands to 23 lots and about eight-tenths of an acre of Hartzell Lands. The loss of $9,863.37 sustained in 1945 was deducted in full from ordinary income and allowed by the Treasury Department. About $200,000 of the proceeds of sale of property was withheld from distribution to stockholders and invested in Government bonds as a reserve for real estate held in any period of depression. In its return for fiscal years ending in 1932 through 1938 petitioner specified that its "kind of business" was "real estate." The form of return for 1939 for the first time provided for a choice of subdivisions under the general classification of "real estate" as follows: " - Real estate dealers and realty development companies. " - Agents and brokers, including property-management companies." The returns of petitioner *251 for the fiscal years ending June 30 in 1939 and 1940 contained an "X" in the first subdivision. The form of return was again changed in 1941 and serial numbers were provided for designating the classification of the taxpayer's business according to definitions. For taxable periods after June 30, 1940, including the taxable years, petitioner used a number which designated its business as "Owner-operators of improved property and lessors of buildings." The property in question was not held by petitioner primarily for sale to customers in the ordinary course of its trade or business. Opinion The issue is factual and turns on whether the improved properties sold in 1945 and 1946, sales of unimproved land not being involved, were held by petitioner "primarily for sale to customers in the ordinary course of his trade or business." Section 117 (a) and (j), Internal Revenue Code. We have said: "* * * The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or *252 his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. Boomhower v. United States, 74 Fed. Supp. 997. No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case." W. T. Thrift, Sr., 15 T.C. 366. See also Thomas E. Wood, 16 T.C. 213, 226, and Albert Winnick, 17 T.C. 538. Petitioner was created in 1932 to acquire, in exchange for its stock, real property, improved and unimproved, and other assets from most of the beneficiaries of a trust created by the will of the decedent. Non-participating beneficiaries of the trust received their distributions in kind. Petitioner's charter gave it general powers with respect to the real property. But charter power to sell is not controlling. Loughborough Development Corp., 29 B.T.A. 95; Burkhard Inv. Co. v. United States, 100 Fed. (2d) 642. The primary object of petitioner was to eventually liquidate the assets and, in the meantime, conserve the property for the best interests of the stockholders. That purpose and policy were reiterated, in effect, in a resolution *253 adopted by the petitioner's board of directors in August 1944. Some of the improved properties were in disrepair when received, and thereafter necessary work was done to put the premises in condition to produce the greatest possible amount of rental income. The unimproved lands were not producing income, and taxes and maintenance costs were a drain on the treasury of petitioner. As to them, petitioner had a policy of selling to rid itself of upkeep expenses, and for that purpose posted for sale signs on the premises and otherwise endeavored to dispose of lots whenever possible. The same policy did not exist in connection with the improved properties involved here. Petitioner's principal activity concerning the improved property was to lease it at the highest rental possible to await an advantageous time for sale. The property was never advertised for sale and no other means were taken to interest prospective buyers. Such sales as were made resulted from unsolicited offers. At no time important was it held primarily for sale in the ordinary course of business. An intention to eventually sell at a price advantageous to stockholders is not decisive. Most properties being held solely for *254 investment are subject to purchase at a price high enough to persuade the owner that it would be more profitable for him to sell than to continue to hold the asset. Frieda E. J. Farley, 7 T.C. 198; White v. Commissioner, 172 Fed. (2d) 629. Here there was a minimum of sales activity in relation to the property in question. While statements, such as appeared in returns filed by petitioner for years prior to 1941 to the effect that it was a real estate dealer, are treated as admissions against interest, White v. Commissioner, supra, the returns made thereafter, including the taxable years, contained no such admission; instead the business was listed as "Owner-operators of improved property and lessors of buildings." The evidence here establishes, in our opinion, that the property was not held primarily for sale in the ordinary course of petitioner's trade or business. Accordingly, it was error for respondent to treat the gain in question as ordinary income. Decision will be entered under Rule 50. Footnotes
1. Through 1944. ↩
2. Through 1947. ↩
3. Through 1945. ↩
4. Through 1946. 5. Through 1940.↩