Thomas E. Reese and Blanche S. Reese, husband and wife, v. Commissioner.
Reese v. Commissioner
Docket No. 42654.
United States Tax Court
T.C. Memo 1954-134; 1954 Tax Ct. Memo LEXIS 112; 13 T.C.M. (CCH) 823; T.C.M. (RIA) 54240; August 23, 1954, Filed *112 Lester I. Bowman, Esq., Union Trust Building, Petersburg, Va., for the petitioners. Ralph G. de Quevedo, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves the following deficiencies in income tax and penalties: Year
Deficiency
5% Penalty
1947
$58,185.58
$2,909.28
1948
10,424.26
521.21
The issues are: (1) whether profit realized from sales of real estate is taxable as ordinary income or as capital gain; (2) whether certain bank deposits of cash and an amount allegedly representing the excess of loans over repayments are includible in gross income, and (3) whether the negligence penalties were properly imposed. Findings of Fact Petitioners are husband and wife and reside in Wakefield, Virginia. They filed joint income tax returns for the taxable years with the collector of internal revenue for the district of Virginia. The husband will be hereinafter referred to for convenience as the petitioner. Petitioner, now 54 years of age, has been connected with the lumber business since he was 11 years old. From 1937 to 1942 he lived at Jarratt, Virginia, where he was employed *113 by a manufacturer of insulation material as industrial manager. During that period he also operated saw mills and stave mills of his own, made investments in real estate, and built houses in Jarratt for rental purposes. In 1942 petitioner entered the employ of Edwin C. Bell Company, in Wakefield, as manager of its subsidiary corporations, the Surry Cooperage Company and Mitchell Stave Mill Company, hereinafter referred to as Surry and Mitchell, respectively. Surry and Mitchell owned timber land, held timber cutting contracts and operated seven stave mills for producing staves for its parent. On May 25, 1946, petitioner purchased all of the assets of Surry and Mitchell for $400,000, part of which was paid out of the proceeds of sale of two tracts of land acquired in the transaction. Petitioner borrowed $190,000 from the Bank of Sussex and Surry, Wakefield, Virginia, on August 12, 1946, and used the proceeds to make another payment on the purchase price. The business acquired was operated by petitioner during the taxable years under the trade name of Reese Stave and Lumber Company. In 1947 petitioner purchased in 12 transactions, at a total cost of $200,670, 5525.60 acres of land *114 and timber in 19 tracts, and 16 building lots. In 1948 he purchased in 16 transactions, at a cost of $81,245, a total of 2070.34 acres of land and timber in 18 tracts, and 2 building lots. The note petitioner gave the Bank of Sussex and Surry was not paid in full on maturity at the end of March 1947. About June 1, 1947, the bank demanded payment and threatened to sell the security it held as collateral. In order to obtain funds to pay the obligation petitioner was forced to place some of his holdings of land and timber on the market for sale, and thereafter he made arrangements with a real estate broker in Richmond, Virginia, to solicit buyers for the property. In 1947 petitioner made 11 sales of 16 tracts of land and timber. In 1948 he sold 5 tracts of timber and 1 tract of land and timber in three transactions. Two of the sales in 1947, involving 6 parcels, were made to obtain funds to satisfy demands of the Bank of Sussex and Surry for payment of the note it held of petitioner. Three of the 6 tracts were acquired by petitioner in his purchase of assets of Surry. One of the other tracts known as the Thacker tract was purchased by petitioner on January 24, 1947, in connection *115 with his timber cutting operations. The proceeds of the sales were placed in escrow and used to make payment of $154,750 on the note. The payments left a balance of $25,000, for which petitioner gave the bank a renewal note. The circumstances surrounding the acquisition and sale of the other tracts sold in 1947 were as follows: Clay Tract This parcel, consisting of 1.52 acres, was the land remaining out of a tract purchased in 1937 for farming and residential purposes. Upon taking up his residence in Wakefield in 1942, petitioner sold all of the acreage except this parcel which had been cut off by a highway. Petitioner had forgotten about the small parcel remaining until he was asked to sell it in 1947. George Cox Tract The uncut timber on this tract, consisting mostly of hardwood, not used by petitioner to make staves, was acquired by petitioner on May 25, 1946, as part of the assets of Surry. The owner of the land did not desire further timber cutting operations on the property because of the damage it would do to his land and requested petitioner to sell the timber to him to avoid such damage. William Cocke Tract The timber on this tract was acquired as part of *116 the assets of Surry. Petitioner agreed in that transaction to hold this property for sale to the buyer at cost when he needed more timber to cut. The sale was made to carry out that understanding. Horsehoe Tract Petitioner and George Bernard acquired equal interests in this property in 1936, several years after which they recovered most of their investment through a sale of the timber. Bernard suffered a heart attack in 1945 and thereafter requested petitioner to purchase his interest in the property. Petitioner did not need the land but nevertheless bought the outstanding interest of Bernard. In 1947, after the land had been burned over, petitioner sold the tract as the result of an unsolicited offer. Ellsworth Tract Petitioner acquired this tract in 1946 to use in connection with his stave business. After disposing of the timber rights he sold the land as the result of an unsolicited offer. Forest and Rucks Tracts The Forest tract was acquired on March 11, 1947, and the Rucks tract in 1946 as part of the assets of Surry. The parcels were a long distance from any mill being operated by petitioner. A normal business practice among owners of saw mills and stave mills *117 operating in competitive territory is to exchange or sell timber tracts among themselves to obtain a closer supply of timber. These tracts were sold in one transaction to give the buyers a supply of timber closer to their mills. Surry Tracts #112 and #113 These parcels were acquired from Surry in 1946. Petitioner sold his timber rights a short time before the expiration date of his cutting rights as an accommodation to the operator of a saw mill in the vicinity. The buyer requested petitioner to make the sale. Prior to 1948 petitioner consolidated the operations of 5 of his 7 mills in one plant at Wakefield to reduce production costs. Later, while seeking a loan to overcome serious financial difficulties resulting from the new venture, he received an offer to purchase the mill, subject to a sale of some of his timber rights. Petitioner accepted the offer and, as part of the sale of the plant, conveyed 4 tracts of timber, one of which had been acquired from Surry. One of the other timber tracts sold in 1948 was acquired in 1947 as part payment of one of the tracts sold in that year. It was sold because of its extreme distance from any mill being operated by petitioner and it *118 had been burned over. The remaining tract sold in 1948, and consisting of timber, was acquired jointly with two others in May, 1948, for investment purposes and its desirability for hunting and fishing. It was located at too great a distance from any of petitioner's mills for profitable use in his business, and the timber on the land consisted of oak and poplar, which petitioner did not use in his business. The timber was sold at the request of the buyer, which needed the timber to supply a mill it was operating in the vicinity of the tract. Petitioner cut timber in 7 tracts in 1947 and 11 in 1948. Petitioner never advertised land or timber for sale. In 1944 the administrator of an estate requested petitioner to assist him in disposing of timber tracts of the estate and suggested that a real estate license be obtained so that legal payments of commissions could be paid on any sale he might make. Upon applying for a license in the name of C. F. Spain, a timber cruiser, whom petitioner desired should handle the transactions, petitioner was advised that a license could be issued to them jointly without additional charge. Such a joint license was issued and was renewed each year *119 thereafter through 1947. Petitioner reported in his return for 1947 the amount of $1,500 for commissions received from sales of real estate. The land and timber tracts in controversy were not held by the petitioner primarily for sale in the ordinary course of his trade or business. During the taxable years and for at least two years prior thereto petitioner made small loans in cash to employees and others. The loans to employees and repayments were entered in a book. The repayments and loans made in 1947 and 1948 were as follows: 1947
1948
Repayments
$4,687.42
$4,654.09
Loans
3,002.02
2,644.49
Excess
$1,687.40
$2,009.60 At times petitioner issued checks to employees and friends for cash. Petitioner sustained a loss about 1917 in a bank failure. Since then he has always kept some cash on hand. Since 1929 petitioner has had a bank safe deposit box in which to deposit cash. The cash received by petitioner for checks and in payment of loans was put in his pocket, or in a safe in his office, or in the safe deposit box, until he accumulated an amount sufficient to justify making a deposit in his bank account. At times petitioner would have about $1,000 *120 in his office safe. In his determination of the deficiencies respondent included in taxable income for 1947 the amount of $4,700 for "unidentified cash deposits" and $961 for "unidentified cash expenditures," and for 1948, $1,050 for "unidentified bank deposits," made as follows: 1947
1948
Deposits: Personal account
March 17
$ 500
March 22
1,400
July 14
900
Mill account
March 17
400
May 14 $1,050
July 8
500
Aug. 11
1,000
Total
$4,700
Cash expenditures
$ 961 *
The book kept by petitioner for loans was examined in connection with the determinations. Opinion The difference between the parties under the primary issue is the factual question of whether during the taxable years the activities of petitioner in the sale of land and timber constituted a business within the meaning of section 117(a)(1), I.R.C. The turning point of the proceeding is whether the parcels were "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Certain tests *121 have been recognized as helpful in passing on questions like the issue here. They include the purpose for acquiring and selling the property, the frequency of sales, and the activities engaged in to make sales. See W. T. Thrift, Sr., 15 T.C. 366; Thomas E. Wood, 16 T.C. 213, and Martin Dressen, 17 T.C. 1443. Petitioner was required to have a source of supply of timber to cut in connection with the operation of his mills, nearby if possible to minimize production costs. There was a business practice among mill owners to exchange or sell to each other timber tracts to have a closer supply. Some of the sales in the taxable years were made in pursuance of that custom. Other of the sales were made necessary to raise money to pay a matured note, or as a condition to the sale of a mill. Only sufficient sales were made to obtain the required funds. In some instances the land was sold after the timber was cut or burned over. In one case the land had been acquired for farming and residential purposes and in another petitioner sold at cost to comply with an agreement he made when the timber was conveyed to him by Surry. Petitioner never advertised *122 any of the properties for sale and, except in 1947, in connection with the forced sales to raise capital, never listed any of the property with a real estate agent. The facts disclose normal sales activities in connection with the operation of petitioner's admitted business. Accordingly, respondent erred in not treating the profits realized from the sales as capital gains. The inclusion in income of bank deposits generally occurs when no books are kept or the accounts maintained are inadequate to clearly reflect income, or there is evidence disclosing a source of taxable income not reflected in a return. Here the adequacy of petitioner's records to disclose his income from sources revealed in the returns for 1947 and 1948 is not questioned by the respondent, and no other activity is relied upon or suggested by respondent as the means by which the additional income was earned. His determination was that the bank deposits were unexplained, and, therefore, constitute taxable income. In addition, he included in income for 1947 the amount of $961 for dealings in loans. Petitioner's explanation for the deposits of cash in controversy is that they came from reserves of cash that he *123 consistently kept for emergencies, and proceeds of loans made to employees and others. Testimony of petitioner that he kept reasonable amounts of cash in safe depositories at all times important to insure some working capital if his funds on deposit in a bank were tied up, and that he deposited some of such money in his checking accounts, is corroborated by other witnesses, including the cashier of the Bank of Sussex and Surry, Wakefield, Virginia, where the deposits in question were made. Another source for the deposits was cash received in repayment of loans. Respondent now concedes that during the taxable years the repayments and loans made were in the amounts set forth in our findings. They disclose an excess of payments over loans of about $1,700 in 1947 and $2,000 in 1948. The item of $961 is reflected in the agreed amount of $1,700 and requires no separate treatment. There is no suggestion in the evidence that the collections on loans were other than returns of capital and, therefore, nontaxable. We conclude that the petitioner has made a sufficient showing of sources for the deposits to overcome the finding of respondent. Accordingly, the issue is decided in favor of petitioner. *124 The negligence penalty imposed by respondent is based upon alleged failure of petitioner to maintain records sufficient to explain the bank deposits. Whatever deficiencies there might have been in that regard is fully offset by the proof made by petitioner at the hearing and we sustain him on this issue. Decision will be entered under Rule 50. Footnotes
*. This amount was determined as the excess of cash loans of $3,320 and repayments not going through a bank account.↩