William H. Davis and Dorothy M. Davis v. Commissioner. William C. Davis v. Commissioner.
Davis v. Commissioner
Docket Nos. 6491-67, 6493-67.
United States Tax Court
T.C. Memo 1969-219; 1969 Tax Ct. Memo LEXIS 75; 28 T.C.M. (CCH) 1167; T.C.M. (RIA) 69219; October 16, 1969. Filed Robert E. Albright, Alan T. Durst, and Ralph W. Lucas, 42 East Gay St., Columbus, Ohio, for the petitioners. Rodney G. Haworth, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income taxes of the petitioners for the taxable years and in the respective amounts as follows: *90 Docket No. 6491-67
Year
Deficiency
1963
$26,970.46
1964
51,715.97 *901965
25,751.00
Docket No. 6493-67
1964
25,127.54
1965
128.00
In docket No. 6491-67, the issue to be decided is whether respondent has erred in determining that petitioners in 1964 made a purchase of real property from a corporation, the stock of which was wholly owned by them, at a price less than the fair market value thereof, and in treating the excess *76 fair market value thereof as dividends to petitioners. In docket No. 6493-67, the issue presented is whether respondent has erred in disallowing capital gains treatment with respect to petitioner William H. Davis' profit on the sale of real property in 1963. All other issues raised by the pleadings have been settled by the stipulation of the parties filed in this case, which settlement will be given effect under Rule 50. 1168 Findings of Fact All facts which have been stipulated are found as fact herein. The petitioners in docket No. 6491-67 are individuals who resided at Columbus, Ohio, when their petition was filed in this proceeding. Their returns for the periods herein involved were filed with the district director of internal revenue at Cincinnati, Ohio. The petitioner in docket No. 6493-67 is an individual who resided at Columbus, Ohio, when his petition was filed in this proceeding. His returns for the periods herein involved were filed with the district director of internal revenue at Cincinnati, Ohio. The notice of deficiency in each docket was timely issued and served. Dividend Issue On January 10, 1961, a tract of land located on Livingston Avenue *77 at the southeast corner of Lonsdale Road in Columbus, Ohio, was acquired in its entirety by Willamont, Inc., an Ohio corporation, the stock of which was owned 40 percent by petitioner William H. Davis, 20 percent by his wife, petitioner Dorothy M. Davis, and 40 percent by petitioner William C. Davis, the adult son of William H. Davis. On April 14, 1964, Willamont, Inc., contracted to sell 8.17 acres of the tract to Davis Investment Company for a price of $5,000 per acre, or a total price of $40,850. At all times material to this proceeding, William H. Davis was president of Willamont, Inc., and Davis Investment Company was a partnership composed of William H. Davis, with an interest of 40 percent, Dorothy M. Davis, with an interest of 20 percent, and William C. Davis, with an interest of 40 percent. On May 1, 1965, Davis Investment Company contracted to sell the 8.17-acre tract to a partnership known as Berwick Arms Company for $120,000. At that time, Berwick Arms Company was owned 20 percent by William H. Davis, 20 percent by William C. Davis, 10 percent by Dorothy M. Davis, 25 percent by Sam Sherman, and 25 percent by Minnie Sherman. Ultimate Finding On April 14, 1964, when *78 acquired by Davis Investment Company from Willamont, Inc., the 8.17-acre tract had a fair market value of $40,850. Capital Gains Issue During 1959, William H. Davis (with respect to this issue will hereinafter be referred to as petitioner) became interested in a tract of 152 acres, more or less, situated in Blendon Township, Franklin County, Ohio, on Dempsey Road, known as the Phelps Farm. On September 12, 1959, Robert E. Albright executed a purchase contract as trustee on behalf of petitioner relating to the Phelps Farm, a part of which contract provided: This contract is contingent upon determination of the following matters. 1. Determination of an adequate water supply with the right to make test drilling of wells within a period of sixty days at the expense of the buyer. 2. Contingent upon sewage disposal plant with a right of sixty (60) days time in which to determine as to sewage disposal adequacy thereof and feasibility of the construction of a disposal plant. 3. Determination as to adequacy of electricity and gas. 4. Contingent upon the buyer obtaining Goldberg's farm located to south of seller's said premises. The contingencies were included in the contract *79 at the request of petitioner who expected that the availability of utilities would increase the value of the property. The contingencies were waived upon the execution of a new contract dated July 12, 1962, which resulted from settlement of litigation between petitioner and the Phelps. Subsequent to September 12, 1959, and prior to July 1962, property adjacent to the Phelps Farm was acquired by the "Huber people" who installed a sewer and water plant thereon for the purpose of providing such service to property in the area. During July 1962, petitioner, through his trustee, secured title to the Phelps Farm. On January 15, 1963, petitioner granted an option to the Ohio Holding Company to purchase all but 16.453 acres of the Phelps Farm. The Ohio Holding Company is a corporation owned by the law firm of Lucas, Prendergast, Albright, Gibson, Brown, and Newman, the law firm representing petitioners in this proceeding. The company acted in the capacity of a trustee in acquiring the Phelps Farm. On December 31, 1963, the Ohio Holding Company exercised its option with 1169 respect to the Phelps Farm and immediately transferred the property to the following described corporations, *80 the stock of which was owned 40 percent by William H. Davis, 20 percent by Dorothy M. Davis, and 40 percent by William C. Davis: Ash Grove, Inc.
Park Grove, Inc.
Beech Grove, Inc.
Pine Grove, Inc.
Blue Grove, Inc.
River Grove, Inc.
Brook Grove, Inc.
Spring Grove, Inc.
Cedar Grove, Inc.
Walnut Grove, Inc.
Elm Grove, Inc.
White Grove, Inc.
Green Grove, Inc.
Wood Grove, Inc.
Maple Grove, Inc. After merger of the above corporations, the legal title to the property was transferred to the successor corporation, Park Grove, Inc. As part of the aforementioned transactions, the purchasers (Grove Companies) paid petitioner $50,000 during 1963, assumed the balance then due on his mortgage of $103,364.94, and executed a note and mortgage for the balance of $284,817.46. During 1965, petitioner also received $68,800 plus interest from the purchasers who at that time had been merged into Park Grove, Inc. Before exercise of the option and the transfer of title to Park Grove, Inc., petitioner had made no effort of any kind to effectuate a sale thereof. He had never personally been in the business of dealing in the purchase and sale of raw land or the development *81 thereof for subdivision purposes. In this instance, he did nothing personally to develop the Phelps Farm for such purposes. All of the Grove Companies mentioned herein were primarily engaged in real estate subdivision and development. Petitioner was president of those companies and William C. Davis was office manager and secretary-treasurer. When the Phelps Farm was sold by petitioner to the various Grove Companies, he knew that the property would be subdivided and that lots would be offered for sale to prospective homeowners. It was for this purpose the property was transferred and it was at that time essentially ready for subdivision purposes. Once the Ohio Holding Company acquired its option to the Phelps Farm, the various Grove Companies commenced a feasibility study regarding subdivision of the property. In addition, those companies commenced efforts with respect to surveying, subdividing, platting, and the securing of utilities for the property, all prior to their actual purchase. After acquisition of the Phelps Farm by the various Grove Companies, the property was in fact subdivided and lots were sold from the subdivision. Ultimate Finding Petitioner at no time *82 held the portion of the Phelps Farm sold to the Ohio Holding Company for sale to customers in carrying on a trade or business. Opinion Dividend Issue Our finding as to the value of the real property (8.17 acres) purchased by Davis Investment Company from Willamont, Inc., as of the date of the sale and purchase are dispositive of this issue as all parties agree that unless the price paid by petitioners was less than the fair market value thereof, no dividend was received by them. Based upon the preponderance of expert testimony, we have concluded that the value of the 8.17 acres at the date of its purchase by Davis Investment Company was $5,000 per acre, or $40,850 in aggregate. William H. Davis has been an officer of corporations or partnerships which dealt in real estate for many years and such association has, we think, qualified him, outside the fact that he was a purchaser, to give his opinion as to the fair market value of the property in question. We think, however, that his opinion that the property was worth $5,000 per acre must be viewed in the light of any personal bias he might have because of his being a party to this action. Because, however, of the testimony *83 of disinterested expert appraisers which substantiates his valuation, we think his bias is to be discounted. An appraiser of admitted qualification has placed a valuation of from $3,750 to $4,250 per acre upon the 8.17 acres in controversy. He has done so upon the basis of a sale of other property which, while some distance removed from the involved acreage, was nevertheless of like character, and the sale used in comparison was reasonably close in time to the sale with which we are concerned. He has concluded and we hold that the highest and best use for the 8.17 acres at the time of its purchase was the holding thereof pending commercial development of its surrounding area. It was zoned as commercial at the time of its purchase. Davis Investment Company had for long been engaged in the development and sale 1170 of raw land for commercial purposes and the partners intended at the time of this purchase to construct a shopping center upon the acreage. The partnership was forced to abandon its intention, however, because it became apparent that suitable tenants for a shopping center could not be obtained, which resulted in an inability to obtain financing for such construction. These *84 facts were also considered by this appraiser in arriving at a fair market value. Also considered by him was the fact that the property, for commercial purposes, was to be approached only from a side road, even though it abutted upon a through highway intersection. Another appraiser, whom we find equally qualified, was not only disinterested but a prospective competitor of petitioner's partnership. For many years he had been in the business of buying and developing real property and had acquired a tract of land directly across the road from the 8.17-acre tract. He had constructed a shopping center on his land and had experienced the same difficulty in obtaining suitable tenants and, therefore, sufficient financing as that with which Davis Investment Company had been subsequently faced. He had been forced to lease to less than desirable tenants. He was well aware of the surrounding physical environment and we think peculiarly well qualified to arrive at the proper fair market value of the 8.17 acres at the date of its purchase from Willamont, Inc. His opinion thereof was from $5,000 to $7,500 per acre. Respondent's sole expert witness was also admittedly well qualified, but we think *85 his method of arriving at a fair market value ($120,000) herein is not sufficiently clear to permit us to give his opinion sufficient weight to preponderate over that of petitioners' appraisers. His use of comparable sales of land was somewhat remote from the instant property and also such sales were shown to be later in time. He did use a discount factor to compensate for these differences, but we are unable to determine how he arrived at such a discount as distinguished from a greater or lesser one. Even he, however, agreed that petitioner William H. Davis' and the independent appraisers' evaluations were substantially correct both in amount and with respect to the factors which they took into consideration. His stated reason for the wide variance between his evaluation and that of petitioners' appraisers was that the latter evaluations were based upon the acquisition of large acreage of raw land, whereas his was based upon only the 8.17 acres in question. He also agreed that the highest and best use of this acreage was to hold the same awaiting commercial development. We understand from this agreement between appraisers as to the highest and best use of the property as of the date *86 of its purchase by Davis Investment Company, that its fair market value as a building site for apartment houses was less than its value as potential commercial property. We note also that his evaluation as of April 14, 1964, is exactly the amount paid by Berwick Arms for the construction of apartments on May 1, 1965. After careful consideration of his testimony, we have concluded that his appraisal is heavily weighted by hindsight and is not to be accorded sufficient force to equal or preponderate over that of petitioners' appraisers. We find for petitioners on this issue in accordance with our ultimate findings. Capital Gains Issue On this issue, William H. Davis will be referred to as petitioner. On September 12, 1959, he contracted, through his trustee, to purchase a farm lying outside the city limits of Columbus. No sewer or water facilities were available to the farm lands, and, according to petitioners' information concerning the future extension of these facilities from Columbus, they would not be provided for 8 or 9 years to come. The grantors under the contract refused to comply therewith at the date of closing and petitioner, through the trustee, instituted suit *87 for specific performance. Litigation extended over a period ended July 12, 1962, when settlement was effectuated by the execution of a new purchase and sale contract calling for an increased purchase price. Two days thereafter, the trustee received title to the property subject to a purchase money mortgage of $150,000. Petitioner at that time paid the initial installment of $62,228.82. On January 14, 1963, he paid interest on the obligation of $3,375 and paid a principal and interest installment on July 16, 1963, of $54,108.33. As we have found on this issue, petitioner had never personally engaged in the business of development of raw land for subdivision purposes or the holding thereof for the purpose of resale to customers. Park Grove, Inc., on the other hand, was then engaged in the business of subdividing 1171 raw land into lots and the selling of lots to customers. We think it fair to conclude from the record as a whole, and particularly because of petitioner's stock ownership and official capacity in Park Grove, that from the time he acquired title to the farm property, he intended to sell it at a profit, not to customers generally, but specifically to Park Grove. He personally *88 during his holding of the property was completely passive with respect to any effort either to sell the land to others or to develop it for sale as a subdivision. Its readiness for subdividing prior to the extension of Columbus sewer and water facilities resulted from the availability of such facilities from a privatelyowned purveyor thereof which constructed its plant on land adjacent to that of petitioner subsequent to his acquisition of title thereto. Repondent's determination of the deficiency herein is based upon the provisions of section 1221(1) [1] of the Internal Revenue Code of 1954. This statute and the regulations thereunder, section 1.1221-1(b), Income Tax Regs., provide that the term "capital asset" does not include property held by the taxpayer "primarily for sale to customers in the ordinary course of his trade or business." While it is cause for close scrutiny, the fact that taxpayer is and has been an officer of a corporation with whom he deals as an individual, and is with his family the owner of all the stock thereof, is not sufficient alone to attribute to him the intent and purpose of the corporation with respect *89 to the use or purpose for holding property. John Junker Spencer, 19 T.C. 727 (1953). Park Grove, Inc., was separate and distinct from its shareholder and officers, and respondent makes no claim here that it is a sham corporation. We can see no reason to hold that because the corporation was engaged in the business of subdividing raw land and the sale of lots therefrom, that petitioner is hereby to be held to have carried on that business. The record contains ample evidence, unrefuted by respondent, that petitioner as an individual has never been engaged in that business. If more is needed, even though we have concluded that petitioner held the farm land for the purpose of *90 selling it to Park Grove, Inc., with the intention that the corporation would subdivide and sell the property, this is not tantamount to his holding the same for sale to customers (see Thomas E. Wood, 16 T.C. 213 (1951)), but is indicative instead of an isolated transaction unrelated to a business of the taxpayer entered into for the production of income. Such transactions are specifically "not excluded from the term 'capital assets'" under the above-cited regulation. We find for the petitioner on this issue. He is to be accorded capital gains treatment on his gains from the sale of the Phelps Farm. Decisions will be entered under Rule 50. Footnotes
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade of business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩