THOMAS E. WOOD, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 21564. Promulgated January 29, 1951.

*Robert S. Marx, Esq.*, and *Frank E. Wood, Esq.*, for the petitioner.
*Hugh F. Culverhouse, Esq.*, for the respondent.

OPINION.

Rice, *Judge:* The gain from the sale of certain whiskey warehouse receipts in 1944 and of certain real estate in 1945 by petitioner was determined by respondent to be ordinary income. Petitioner contends the sales were sales of capital assets under section 117 (a) of the Internal Revenue Code and that the gains therefrom were reported properly as capital gains. Since the sales involved different taxable years and different classes of property, we will discuss each issue separately.

### Whiskey Warehouse Receipts

The applicable statutory provision in effect during the taxable years in question reads as follows:

SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "Capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

Prior to 1934, a trader, as distinguished from a dealer, in securities was taxable on the gains derived from his trading activities in the same manner as the gains of dealers in securities, namely, as ordinary income. Such gains were excluded from the operation of the capital gains provisions of the statute because "capital assets" were defined as not including "property held by the taxpayer primarily for sale in the course of his trade or business." In 1934 Congress amended section 117 for the purpose of treating certain transactions in securities as transactions in capital assets in order that losses incurred in these transactions could not be deducted in full. Congress was prompted to this action by the disclosure that several prominent financial leaders

had paid no Federal income tax during 1930, 1931, and 1932, because their losses on sales of securities offset their very substantial income from other sources.[1] This disclosure had resulted in the insertion of a provision in the National Industral Recovery Act,[2] restricting the deduction of losses upon sales of securities when incurred by "traders or other taxpayers who buy and sell securities for investment or speculation, whether or not on their own account, and irrespective of whether such buying and selling constitutes carrying on of a trade or business." [3]  In the Revenue Act of 1934 Congress sought to accomplish this same result by amending the definition of "capital assets" in the new section 117 so as to exclude, not *all* property held primarily for sale in the course of business, but only such property as was held primarily for sale "to customers" in the "ordinary" course of business. Since the sale on a securities exchange is not usually considered to be a sale "to customers," it was asserted that this amendment made it "impossible to contend that a stock speculator trading on his own account is not subject to the provisions of Section 117" [4]—or, to state it in the positive, that a stock speculator trading on his own account would be subject to capital gain and loss treatment under section 117, as so amended.  See *Francis Shelton Farr*, 44 B. T. A. 683 (1941).

Under the above quoted portion of section 117 it has been held that a trader in securities, as distinguished from a dealer therein, did not hold the securities "primarily for sale to customers in the ordinary course of his trade or business" and therefore the gain or loss recognized by him is treated as capital gain or loss.  *Burnett* v. *Commissioner* (CA–5, 1941), 118 Fed. (2d) 659; *Van Suetendael* v. *Commissioner* (CA–2, 1945), 152 Fed. (2d) 654; *E. Everett Van Tuyl*, 12 T. C. 900 (1949); *Carl Marks & Co.*, 12 T. C. 1196 (1949); *Stifel, Nicolaus & Co.*, 13 T. C. 755 (1949).  It has also been held with respect to traders, as distinguished from dealers, in futures contracts on commodity exchanges, that trading in such contracts are transactions in capital assets and any losses suffered in such transactions are capital losses. *Commissioner* v. *Covington* (CA–5, 1941), 120 Fed. (2d) 768, certiorari denied, 315 U. S. 822.  In that case, the taxpayers were engaged in trading in commodity futures pursuant to the Bylaws, Rules and customs of the New York Produce Exchange.  The Court said at page 770:

We think it quite clear that petitioner was engaged in the business of buying and selling commodities or rights in commodities, using the machinery and provisions of the commodity exchange to do so, and that it is equally clear that

---

[1] Miller, The "Capital Asset" Concept, 59 Yale L. J. 837 (1950).  Latham, Taxation of Capital Gains, 23 Cal. L. Rev. 30, 34 n. 13 (1935).

[2] Section 218 (b), 48 Stat. 209 (1933).

[3] H. Rept. No. 708, 72d Cong., 1st Sess., March 8, 1932, p. 13.

[4] H. Conf. Rept. No. 1385, 73d Cong., 2nd Sess., April 30, 1934, p. 22.

the Board was right in holding that the losses he sustained were capital losses * * *.

In a concurring opinion by Circuit Judge Holmes such a clear and concise explanation of transactions in commodity futures is set forth that we feel it advisable to quote from it at length because of the many similarities which exist between trading on a commodity exchange in futures and trading in whiskey warehouse receipts. At pages 771 and 772, he said:

> Conceding, arguendo, that the taxpayer merely entered into executory contracts, on margins, for the delivery of commodities at a future date which were terminated before the time therein named for delivery, such contracts were intangible property which are deemed to have a value the instant they are made; their subsequent value or lack of value depends upon the market price of the commodity at the time of valuation. These contracts are capable of ownership and of being transferred by act of the parties or by operation of law. They are capital assets within the meaning of Sec. 117 (b) and (d) of the Revenue Act of 1936; but a trader in commodities, on exchanges, does something more (and the taxpayer herein did more) than merely enter into executory contracts.

> This record shows that all of these transactions involved futures contracts executed on exchanges governed by rules which are substantially in accord. In many cases, such contracts culminate in the delivery of the actual commodity, but for the most part those who sell on such exchanges subsequently buy an equal quantity of the same commodity for delivery in the same month in which they sold, making their offsetting purchases before the delivery month is reached. Their sales offset their previous purchases, and the need for actual delivery is avoided by accounting methods employed in exchange clearing houses, just as banks, which are clearing-house members, avoid the needless use of actual money in their daily settlements with each other. All of the contracts of this taxpayer were terminated in this manner without deliveries of the actual commodities, but the trading was in the commodity itself.

> Transactions in commodity futures are commonly spoken of as purchases and sales of a specific commodity such as corn, wheat, or cotton, but the traders really acquire rights to the specific commodity rather than the commodity itself. These rights are intangible property which may appreciate or depreciate in value. They are capital assets held by the taxpayer (whether or not connected with his trade or business), but, unless they are hedges (which are in a class by themselves), they cannot be regarded as stock in trade or other property of a kind which would properly be included in the inventories of the taxpayer if on hand at the close of the taxable year. Neither are they property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

> *    *    *    *    *    *    *

> For purposes of taxation it is immaterial whether this taxpayer was a trader in the actual commodities or in rights to the commodities. In either event his losses which resulted from trading in commodity futures contracts were properly classified as capital losses subject to the limitations of Sec. 117 (d) of the Revenue Act of 1936. The substance of the transaction is the same whether the taxpayer acquires tangible or intangible property. It was the primary purpose of Congress in imposing the capital loss limitation to prevent such trading losses from wiping out all ordinary income for tax purposes. H. Rep. No. 704, 73d Cong., 2d Sess., pp. 30, 31.

See *Taney* v. *Penn Bank*, 232 U. S. 174 (1914), which held that the holder of whiskey warehouse receipts was a preferred creditor in a bankruptcy proceeding involving a distilling company because the receipts were equivalent to the whiskey itself and represented the whiskey. Accord: *Dale* v. *Pattison*, 234 U. S. 399 (1914).

The record in the instant case discloses that petitioner was a member of two partnerships prior to 1942 and was engaged in the business of purchasing and selling whiskey warehouse receipts, financing distilling operations and dealing in collateral loans to distillers. In addition, petitioner was a principal stockholder in a corporation formed to engage in the business of purchasing and selling whiskey, financing distilling operations, and purchasing whiskey distilled by various distillers.

The corporation was dissolved on December 31, 1941, and the two partnerships were dissolved some time in 1942. A part of the assets of the corporation and of the partnerships, consisting of whiskey warehouse receipts, cash, notes, miscellaneous property, and a number of so-called "production contracts" with various distilleries, was distributed to the petitioner on dissolution.

The production contracts extended over varying periods of time, including 1944, the taxable year in question. The record does not disclose whether petitioner ever took physical possession of any whiskey during 1944 or any prior year, although he testified that he organized the East Fork Corporation in 1945 because if he decided to bottle whiskey the tax on the whiskey when withdrawn would be considerable and the corporate form of business would give him less personal liability. On December 28, 1944, petitioner and Buse, as individuals, entered into an agreement with a distilling company, which permitted petitioner and Buse to purchase 50 per cent of the annual production of whiskey or neutral spirits of the distillery. This was an extension of an older agreement dated February 5, 1942, and was to run for a period of 10 years from August 31, 1944. The record is also silent as to whether petitioner ever took physical possession of any whiskey under this contract. Whether petitioner did or did not ever take physical possession of any whiskey under such contracts is immaterial to the decision of this case as will be pointed out hereafter.

Whiskey warehouse receipts are dealt in rather extensively in many parts of the country by individuals who are not dealers in such receipts but who enter into such transactions as a speculation or for an investment. There is in existence an Association of Whiskey Brokers of America which is an organization composed of dealers, as distinguished from traders or speculators in whiskey warehouse receipts, who buy and sell them for customers on a commission basis in a manner similar to brokerage transactions on stock exchanges and transactions in futures on commodity exchanges.

A good description of transactions in whiskey warehouse receipts by dealers is found in *Stitzel-Weller Distillery, Inc.* v. *Norman, et al.*, 39 Fed. Supp. 182 (1941). The case dealt with a fraudulent sale of certain whiskey warehouse receipts. One issue which was considered by the court was whether the purchaser of certain of said receipts had purchased them in good faith. It had been alleged that the unseemly haste in reselling the warehouse receipts within 24 hours of their purchase indicated bad faith. On this issue the court said at page 186:

> Most of these objections fail to give full consideration to the actual circumstances under which the purchases and resales were made. Collins and Newman Company were engaged in buying and selling whiskey warehouse receipts. They were not buying them for investment purposes. A quick turnover is the chief characteristic of such a business. Such dealers keep in touch with the price at which this type of property can be moved, and purchases are made when the opportunity presents itself, at a price somewhat lower, with the expectation of immediately reselling it at a profit. If the property is held a month, or even a week or a few days, conditions might materially change and the transaction be turned into a loss instead of a profit. Accordingly, the short time between the purchase of the receipts by Collins and Newman and the resale to others was in accordance with their usual course of business. * * *

Petitioner was not a member of the Association of Whiskey Brokers of America. He was not listed as a whiskey broker or dealer in any publication which customarily listed them. He did not advertise himself as a dealer. In 1944, the tax year in question, petitioner sold whiskey warehouse receipts covering 1460 barrels of whiskey and this was his sole transaction in such receipts for the taxable year in question. All of the receipts had been held by petitioner for more than six months.

Although the petitioner filed "Special-Tax Returns" for each of the years commencing July 1, 1942, 1943, and 1944, as required of wholesale liquor dealers under the provisions of section 3250 (a) (1) of the Internal Revenue Code and Regulations 20, section 194.27,[5] this definition is not determinative for purposes of section 117 of the Internal Revenue Code as to whether petitioner was a dealer who held whiskey warehouse receipts "primarily for sale to customers in the ordinary course of his trade or business." The definition is broad enough to impose the special tax upon any individual who makes only two sales of whiskey warehouse receipts even though he is merely an investor

---

[5] SEC. 3250. TAX.

    (a) WHOLESALE DEALERS IN LIQUORS.—

        (1) IN GENERAL.—Wholesale dealers in liquors shall pay a special tax of $110.

Regs. 20.

    Sec. 194.27 (a). Persons engaged in the business of selling, or offering for sale, warehouse receipts for spirits in Government Bonded Warehouses, incur liability to special tax, since the sale of receipts is equivalent to the sale of the spirits.

    Sec. 194.27 (b). A single sale involving one or more warehouse receipts by an investor, as distinguished from one who is engaged in the business of selling warehouse receipts, does not subject the vendor to special tax.

therein. The purposes underlying the imposition of such tax and its accompanying regulation are not even remotely connected with the purposes underlying the enactment of section 117, and any argument seeking to establish that an individual who pays the special tax imposed on wholesale dealers in liquors is, ipso facto, a dealer in whiskey warehouse receipts and therefore excluded from capital gains treatment under section 117, must be rejected.

We are not unmindful of the cases dealing with whiskey warehouse receipts under the Emergency Price Control Act of 1942, as amended (56 Stat. 23), which held that a whiskey warehouse receipt was not a "security" as defined in the regulations promulgated under such Act.[6] These cases also held that whiskey warehouse receipts were "commodities" within the scope of such Act. See *Collins* v. *Fleming* (Em. App. 1947), 159 Fed. (2d) 426; *Brown* v. *Cumming Distilleries Corporation*, 53 Fed. Supp. 659 (1944). Congress, in enacting such Act in 1942, was attempting to freeze prices in order to prevent inflation and other ills resulting from unrestrained soaring prices of commodities in a time of national emergency; and in those cases, the courts excluded whiskey warehouse receipts from the definition of "securities" and included them in the term "commodities" in order to give effect to the broad over-all purpose Congress had in mind in enacting such Act. Here again, the purposes underlying the enactment of the Price Control Act and the purposes underlying section 117 were of such a different nature that no analogy can be drawn between the treatment of whiskey warehouse receipts under the Price Control Act and under section 117.

Respondent relies on *Roney* v. *Commissioner* (CA–4), 67 Fed. (2d) 165, certiorari denied, 290 U. S. 705 (1934). In that case whiskey which had been manufactured by the taxpayer and his partner in 1920 and 1921, stored in warehouses and sold in 1927 and 1928, was held to be "stock in trade" which could be included in inventory, and not property held as an investment. The Court held that profit arising from the sale was taxable as ordinary income and not as capital gain. The whiskey sold had been distilled by the partnership of which the taxpayer was a member. Although the warehouse receipts had been changed in form, as the whiskey was transported from one warehouse to another, the receipts eventually sold covered the identical whiskey originally distilled. The case is not in point since the taxpayer was the distiller of the whiskey.

Unquestionably, a whiskey warehouse receipt is a different kind of property from futures contracts and securities such as stocks and bonds. While it is undoubtedly true that Congress intended, in

---

[6] General Maximum Price Regulation Bulletin No. 1, section 9, subsection 15; section 20, subsection (q).

amending section 117 in the Revenue Act of 1934, to treat as capital assets the trading of speculators for their own account on the security exchanges, it is also true that such amendment did not use the term "security" which was a defined term for purposes of the *Price Control Cases, supra.* The term used in the 1934 amendment was "property," which was the same term used prior to the amendment. In the instant case, we are not concerned with whether a whiskey warehouse receipt is a "security," which was a point in issue in the *Price Control Cases, supra,* nor are we concerned with the question of whether a whiskey warehouse receipt is the "commodity" itself, or, as Mr. Justice Hughes said in *Taney* v. *Penn Bank,* 232 U. S. 174, 185 (1914) : "In these circumstances, the certificates [whiskey warehouse receipts]— such as were here used—appropriately represent the property."

The issue here is whether a person buying and selling whiskey warehouse receipts for his own account is holding property primarily for sale to customers in the ordinary course of his trade or business. A whiskey warehouse receipt is property as such term is used in section 117 (a) of the Internal Revenue Code. Assuming, for purposes of argument, that petitioner was engaged in the trade or business of buying and selling bottled whiskey,[7] there is no reason why he could not engage in that business (the gain or loss resulting therefrom being treated as ordinary gain or loss) and also trade in whiskey warehouse receipts for his own account. The cases dealing with traders in securities and traders in futures contracts, heretofore cited, are, to our mind, controlling in this case. The similarity of petitioner's transactions in whiskey warehouse receipts to transactions by traders on commodity exchanges and stock exchanges are of greater significance for income tax purposes than the dissimilarities in such transactions. The petitioner in this case was a trader in whiskey warehouse receipts for his own account in the taxable year 1944, was not holding them primarily for sale to customers in the ordinary course of his trade or business, and the gains derived from such transactions are capital gains.

The respondent also argues in his brief that the whiskey warehouse receipts in this case are stock in trade of the taxpayer which would properly be included in inventory if on hand at the close of the taxable year. Our holding in the preceding paragraph that the warehouse receipts were not property held primarily for sale to customers in the ordinary course of his trade or business disposes of this contention adversely to the respondent. It is well settled that property cannot be classified as stock in trade or property subject to inventory unless it is

---

[7] Section 6 (a) (1) of the Federal Alcohol Administrative Act (49 Stat. 997, 985), prohibits the transfer of bulk whiskey to persons other than a distiller, rectifier of distilled spirits, person operating a bonded warehouse qualified under the internal revenue laws or a class 8 bonded warehouse qualified under the customs laws, a winemaker for the fortification of wines, a proprietor of an industrial alcohol plant, or an agency of the United States or any State or political subdivision thereof.

held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. *Van Suetendael* v. *Commissioner* (CA–2, 1945), 152 Fed. (2d) 654. See also *Gilbert* v. *Commissioner* (CA–1, 1932), 56 Fed. (2d) 361, 362; H. Rept. No. 179, 68th Cong., 1st Sess. (1924), p. 255, section 208 (2) ; *Burnett* v. *Commissioner* (CA–5, 1941), 118 Fed. (2d) 659.

## Real Estate

We come now to the issue relating to the sale of 11 real estate lots by the petitioner in 1945. Respondent determined a deficiency of $7,100.90 for such year on the same theory he used in determining a deficiency with respect to the whiskey warehouse receipts transactions in 1944, namely, that the property was not only held primarily for sale to customers in the ordinary course of the trade or business of petitioner, but also represented stock in trade of petitioner which would properly be included in inventory if on hand at the close of the taxable year.

In determining whether a taxpayer is engaged in the real estate business, for purposes of section 117 of the Internal Revenue Code, the courts have adopted a number of well recognized tests. The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and disposal of it; the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. *Boomhower* v. *United States*, 74 Fed. Supp. 997 (1947) ; *W. T. Thrift, Sr.*, 15 T. C. 366. As was stated in the *Thrift* case, page 369 : "No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case."

Applying these well recognized tests to the facts herein we note that petitioner's purpose or reason for acquiring the lots and the undeveloped acreage had nothing to do with the organization of the real estate business. His investment in the Lakewood Development Co. had definitely turned sour. In addition to his capital stock investment petitioner had guaranteed bank loans of the company which, in December 1940, was also indebted to him individually and was then in need of additional funds. Petitioner, as the minority stockholder, could see no advantage in continuing to finance a business which the majority stockholder either could not, or would not, aid financially. He decided to and did liquidate his investment in the corporation rather than add to it.

Petitioner disposed of some of the lots acquired in December 1940 by sale in 1942 and 1945. We do not know the number of lots that he disposed of in 1942, but we do know that of the 11 lots sold in 1945 seven were transferred to property owners who purchased lots adjacent to their own property. The lots were not sold as a result of any solicitation by the petitioner.

We are convinced, therefore, that while petitioner may have been willing to sell the land acquired from Lakewood at any time, and in fact did make sales prior to and during the taxable year, there was no such continuity, number, or frequency of real estate transactions by petitioner as to justify a holding that he was engaged in the real estate business. *Ehrman* v. *Commissioner* (CA-9, 1941), 120 Fed. (2d) 607; *Snell* v. *Commissioner* (CA-5, 1938), 97 Fed. (2d) 891. He did not attempt to develop the property acquired from Lakewood during the years 1941 through 1945. He did not put any "For Sale" signs on the property. He never advertised it for sale. He did not hold himself out as a real estate agent. He never charged a commission for the sale of real estate. He never had a real estate license. He never purchased any other real estate, except a farm which he still holds as an investment. The 11 lots sold in 1945 had been held by petitioner for approximately four years.

We do not think the formation of the Wood Realty Company in the year following the taxable year in question is material under the facts of this case. While it is true that petitioner formed the Wood Realty Company in 1946, and, in exchange for the capital stock of that company, transferred to it the undeveloped acreage he had received from the Lakewood Development Co., and that the Wood Realty Company built about 200 private dwellings on such acreage and engaged in the real estate business, these facts are not determinative of the present issue. They are merely some evidence tending to show a continuity of business transactions.

There have been numerous decisions concerning whether or not the provisions of section 117 applied to sales of real estate. Each case must be decided on its own facts. While it is frequently difficult to draw a line between a situation where a taxpayer is merely holding property for sale and a situation where his activities in connection with the sale of property constitutes the doing of business under the tax statutes, this is not such a case. The sale of lots in 1945 and prior years were in the nature of a gradual and passive liquidation of an asset. See *Thompson Lumber Co.*, 43 B. T. A. 726 (1941); *Guthrie* v. *Jones*, 72 Fed. Supp. 784 (1947); *Frieda E. J. Farley*, 7 T. C. 198 (1946). The limited number of sales of real estate made by petitioner is, under the facts of this case, insufficient to justify a holding that he held them primarily for sale to customers in the ordinary course of his trade

or business; nor are they stock in trade of the taxpayer which would properly be included in inventory, if on hand at the close of the taxable year for the same reason the whiskey warehouse receipts were not inventoriable. *Van Suetendael* v. *Commissioner* (CA–2, 1945), 152 Fed. (2d) 654.

The gains realized by petitioner on the sale of whiskey warehouse receipts in 1944 and the sale of lots in 1945 are capital gains and are not taxable as ordinary income.

*Decision will be entered under Rule 50.*