## MAULDIN v. COMMISSIONER OF INTERNAL REVENUE
### (two cases).
#### Nos. 4366, 4367.

United States Court of Appeals
Tenth Circuit.
March 19, 1952.

Dorothy Ann Kinney, Amarillo, Tex., for petitioners.

Irving Axelrad, Washington, D. C. (Ellis N. Slack and Fred E. Youngman, Washington, D. C., on the brief), for respondent.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a decision of the Tax Court, holding that certain lots sold by petitioners during the taxable years 1944 and 1945, where "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within the exclusionary clause of Section 117(a) (1) of the Internal Revenue Code, 26 U.S.C.A. § 117(a) (1). If the gain from the sale of these lots was derived in this manner, it constituted ordinary income taxable under Section 22(a), and not a capital gain taxable under Section 117(a) (1). Petitioners, residents of the State of New Mexico, are husband and wife, and all income involved is community income. The two cases were therefore consolidated for trial and disposition. A summary of Mauldin's business activities is necessary to a determination of the issue presented.

C. E. Mauldin, a graduate veterinarian since 1904, who also engaged in some road contracting, moved to Albuquerque, New Mexico in 1916, where he organized a road construction company. While in Clovis, New Mexico in 1920, to bid on a sewer project, he decided to move there and engage in the cattle business. Later in the same year, he contracted to buy 160 acres of land one-half mile from the city limits of Clovis for $20,000.00. This land was particularly suitable for cattle feeding, but was not at that time considered suitable for residential development, because the City, with a population of 5000, was not growing in that direction.

By the time Mauldin finally received title to the land in June 1921, he decided that it was not the time to go into the cattle business because of drought, crop and bank failures, and a decline in the cattle business which continued through 1924. He tried to sell the entire tract in 1924 for less than he paid for it, but was unable to do so, partly because a highway had been surveyed diagonally across the land, splitting it into two tracts and rendering it less suitable for cattle feeding. A real estate agent with whom he listed the property for sale advised him that they would have better success if he divided it into small tracts and blocks. The land was accordingly platted into 29 tracts and 4 blocks containing 88 lots each, and called the "Mauldin Addition". At the time the land was platted in 1924, there was still no demand for residential property in the area. In 1927, he built a home for himself near the center of the Addition.

There were no sales of any consequence until the land commenced to be included in the city limits of Clovis in 1931. By 1939, it was wholly within the city limits, and without Mauldin's request, the City began a paving program in the area, for which he was assessed approximately $25,000.00. When he was unable to pay this assessment, the City instituted suits on its paving liens, and in order to save his property, he divided some additional tracts into lots and devoted most of his time to the sale of the lots in the Addition. He listed the property with real estate agents and otherwise promoted sales through personal solicitations, signs, newspaper advertisements, and gifts of lots to a school and the builder of the first F. H. A. house in Clovis. He stated that at times he would "chase" a prospective purchaser "around the block". During 1939 and 1940, he sold enough lots to liquidate the paving indebtedness.

Mauldin testified that with the indebtedness to the City paid, he decided to hold the remaining portions of the original tract for investment purposes, and after 1940, did nothing to promote sales. He stated, "I cut it up and tried my best to sell it to clear it, and when I cleared it, I quit". From 1940 until 1949, when his health failed, Mauldin devoted full time to the lumber business he organized in 1939. During this period, he had no real estate office, no license to sell real estate, did not advertise the properties by newspapers or signs, had no fixed price for lots, and at times refused to sell certain lots, either because the prospective purchaser would not

pay the asked price, or Mauldin did not wish to sell the particular property at that time. The only real estate purchased by Mauldin after acquiring the 160 acres in 1920 was one "unsightly" block of lots near his residence, and some commercial properties to be used in connection with his lumber business.

Due primarily to the location of war facilities nearby, the City of Clovis grew in population to 14,000 in 1940 and to 20,000 to 25,000 in 1945, and the lots Mauldin Addition were in great demand. By the end of 1945, Mauldin had disposed of all but 20 acres of his original 160 acre tract. This 20 acres was considered by him and real estate dealers to be his most valuable property. Mauldin's records show that he sold 2 lots in 2 transactions in 1941; 11 in 1942 in 2 transactions (6 lots were given to his daughter as a wedding present); 5½ in 1943 in 3 transactions; 5½ in 1944 in 3 transactions; 44½ in 1945 in 15 transactions; 39 in 1946, 1 in 1947 and 2 in 1948. For the taxable years in 1939 and 1940, the taxpayers' income tax returns showed income from real estate only; for each of the years 1941 and 1944 (returns for 1942 and 1943 not shown) they showed net income of approximately $3,000.00 from sales of real estate and approximately $12,000.00 from the lumber business; for the year 1945, $20,484.84 from real estate and $12,339.80 from lumber; and in 1946, $21,942.88 from real estate and $25,005.07 from lumber. On his 1940 return, Mauldin stated that the nature of his business was "real estate"; in 1943 it was shown as "lumber business"; in 1944 he did not designate the nature of his business; and in 1945 it was shown as "lumber and real estate".

In their income tax returns for the years 1944 and 1945, petitioners showed the lots sold during those years as long-time capital assets, and computed the tax accordingly. The Commissioner determined that the profit realized was ordinary income within the meaning of Section 117(a) (1) of the Internal Revenue Code, and assessed the additional tax. This appeal is from the judgment of the Tax Court sustaining the Commissioner, and the only question is whether its judgment on these facts can be said to be clearly erroneous.

It is admitted by taxpayer that during 1939 and 1940, he was engaged in the business of selling the tracts and lots in Mauldin Addition. He earnestly contends, however, that after 1940, his business status was changed; that his full time thereafter was devoted to the lumber business, and held the remaining lots for investment purposes, selling them only through unsolicited offers when the price was right.

There is no fixed formula or rule of thumb for determining whether property sold by the taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business. Each case must, in the last analysis, rest upon its own facts. There are a number of helpful factors, however, to point the way, among which are the purposes for which the property was acquired, whether for sale or investment; and continuity and frequency of sales as opposed to isolated transactions. Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; Annot. 106 A.L.R. 254; Mertens, Vol. 3, Sec. 22.08. And, any other facts tending to indicate that the sales or transactions are in furtherance of an occupation of the taxpayer, recognizing however that one actively engaged in the business of real estate may discontinue such business and simply sell off the remnants of his holdings without further engaging in the business. Snell v. Commissioner, 5 Cir., 97 F.2d 891. Thus, where residents of New York bought land in Florida and elsewhere from time to time for investment, a part of which was platted and improved, it was held that the occasional sale of lots through local brokers was not sufficiently frequent or engrossing to give the taxpayers the vocation of real estate dealers. Phipps v. Commissioner, 2 Cir., 54 F.2d 469. And, in Foran v. Commissioner, 5 Cir., 165 F.2d 705, a taxpayer admittedly engaged as a broker of nonproducing oil and gas leases and royalties purchased a producing property which he sold within eighteen months. The profit realized therefrom was held to be income from a long-time capital asset, the court reasoning that since this was the first pro-

ducing property purchased by the taxpayer, there was no occasion to disbelieve his statement that he acquired it for investment or his motive for selling it.

 On the other hand, sale and exchange of lots in 1939 and 1940 from a 92 acre tract of land, partially subdivided in 1932, was held to be in the ordinary course of business where the taxpayer had been continuously engaged in the real estate business since 1908, and had divided a part of the tract into lots in order to facilitate the sale of the land. Gruver v. Commissioner, 4 Cir., 142 F.2d 363. So too was the sale of lots from a tract of land which had been originally purchased for and used as a lettuce farm, but subdivided into lots when it became too valuable for truck farming operations. Richards v. Commissioner, 9 Cir., 81 F.2d 369, 106 A.L.R. 249. See also Oliver v. Commissioner, 4 Cir., 138 F.2d 910. And, lots sold through sales agencies after reacquisition at a trustee's sale, were held to be in the ordinary course of trade or business, as against the contention that they were sold in furtherance of an orderly liquidation in Ehrman v. Commissioner, 9 Cir., 120 F.2d 607. While the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which it was held. Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263.

Admittedly, Mauldin originally purchased the property for purposes other than for sale in the ordinary course of trade or business. When, however, he subdivided and offered it for sale, he was undoubtedly engaged in the vocation of selling lots from this tract of land at least until 1940. As against his contention that he ceased to engage in the business after 1940, the record evidence shows that he sold more lots in 1945 on a sellers market without solicitation than he did in 1940 on a buyers market. It seems fairly inferable from the record that at all times he had lots for sale, and that the volume sold depended primarily upon the prevailing economic conditions, brought on by wartime activities and their aftermath. It is true that he was in the lumber business, but his returns plainly

show that a substantial part of his income was derived from the sale of the lots. In these circumstances, we cannot say that the Tax Court's conclusions are without factual basis.

The decisions are Affirmed.