GIRARD TRUST CORN EXCHANGE BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36015. Filed September 30, 1954.

*George Craven, Esq.*, and *James F. Gordy, Esq.*, for the petitioner.
*William G. Handfield, Esq.*, for the respondent.

1344

1348

1350

**OPINION.**

BAAR, *Judge:* The first issue for our decision is whether the petitioner must compute its excess profits credit for the year ending November 30, 1944, on a prorated basis whereby the statute in effect for

the calendar year 1943 ("1943 law") should apply in proportion to the number of days of the fiscal year falling in 1943 and the statute in effect for the calendar year 1944 ("1944 law") should apply in proportion to the number of days of the fiscal year falling in 1944.

The dispute between the parties grows out of the amendments made to section 710 and section 714 of the Internal Revenue Code of 1939 by the Revenue Act of 1943, whereby excess profits taxes were increased by means of an increase in the rate of tax and a reduction in the credit allowed upon the basis of invested capital. The specific question here involved concerns the application of these amendments to a fiscal year 1943–1944, beginning on December 1, 1943. Section 201 of the Revenue Act of 1943 provided:

SEC. 201. TAXABLE YEARS TO WHICH AMENDMENTS APPLICABLE.

Except as otherwise expressly provided, the amendments made by this title shall be applicable only with respect to taxable years beginning after December 31, 1943.

An exception with respect to the computation of tax for fiscal years beginning in 1943 and ending in 1944, such as is here involved, was expressly made by adding to section 710 (a) of the 1939 Code a formula for a proration of two computations of tax liability, as prescribed by the new subparagraph (6) which is set out in the margin.[1] There is no provision specifically dealing with the determination of the excess profits credit or unused excess profits credit of such a fiscal year.

According to the respondent's computation the petitioner's excess profits credit for the fiscal year ended November 30, 1944, which was based on invested capital under the provisions of section 714 of the 1939 Code, reflected an apportionment of the amounts computed under section 714 before and after amendment by section 205 of the Revenue Act of 1943, similar to that specified in 1939 Code, section 710 (a) (6). The petitioner urges that such excess profits credit is to be determined solely under the provisions of 1939 Code, section 714, as applicable to the year 1943, prior to its amendment by section

---

[1] Internal Revenue Code of 1939.

SEC. 710. IMPOSITION OF TAX.

  (a) IMPOSITION.—

    *     *     *     *     *     *     *

    (6) TAXABLE YEARS BEGINNING IN 1943 AND ENDING IN 1944.—In the case of a taxable year beginning in 1943 and ending in 1944, the tax shall be an amount equal to the sum of—

        (A) that portion of a tentative tax, computed as if the law applicable to taxable years beginning on January 1, 1943, were applicable to such taxable year, which the number of days in such taxable year prior to January 1, 1944, bears to the total number of days in such taxable year, plus

        (B) that portion of a tentative tax, computed as if the law applicable to taxable years beginning on January 1, 1944, were applicable to such taxable year, which the number of days in such taxable year after December 31, 1943, bears to the total number of days in such taxable year. [As amended by Revenue Act of 1943, section 203 (a).]

205 of the Revenue Act of 1943, without reflecting the reduction of the credit for the year 1944 accomplished by that amendment.

In our judgment the necessary interpretation of the statutory provisions to which we shall refer results in an exception "expressly provided," under which the 1943 amendment of section 714 is applicable for the determination of the unused excess profits credit of a taxable year beginning before December 31, 1943. We therefore sustain the respondent upon this issue. The arguments to the contrary are strongly presented in the petitioner's brief, from which extracts are given in the margin.[2]

---

[2] "The petitioner's unused excess profits credit for the year ended in 1944, as defined in Section 710 (c) (2), is 'the excess, if any, of the excess profits credit' for that year over 'the excess profits net income' for that year. The unused excess profits credit is thus defined specifically by statute and is not governed in any way by Section 710 (a), which imposes the tax. * * *

"As applied to the petitioner, if there had been a tax payable for its fiscal year December 1, 1943 to November 30, 1944, the tax so imposed would have been $31/366$ths of a tentative tax computed by the first method plus $335/366$ths of a tentative tax computed by the second method. However, the statute does not provide for proration of any element other than the tentative taxes so computed. Since the petitioner had no tax to pay for that year, the proration provision has no application whatsoever. * * *

"Except as otherwise expressly provided, the 1943 amendments do not apply to a taxable year beginning prior to January 1, 1944. There is no express provision which authorizes the use of the 1943 amendment in computing the excess profits credit or the excess profits credit carry-over to the following year. The statute which provides for proration in computing tax imposed for a fiscal year beginning in 1943 and ending in 1944 does not authorize a proration for any other purpose. * * *

"The Revenue Act of 1943 does not contain any provision which purports to change the excess profits credit or the net income for a taxable year beginning in 1943 and ending in 1944. It follows, therefore, that the petitioner's excess profits credit, its excess profits net income and consequently its unused excess profits credit for the year ended in 1944 must be computed without regard to the 1943 amendment.

"In attempting to reduce the petitioner's excess profits credit carry-over by applying an amendment which relates solely to the imposition of the tax, the respondent distorts the plain language of the statute. * * *

"It would be a strange result here if an amendment relating solely to the imposition of the excess profits tax and contained in a section relating solely to such imposition should be found to apply to a wholly different section of the law, relating to the computation of the excess profits credit and the unused excess profits credit, which are specifically defined in unamended sections.

"Moreover, in cases where Congress intended that an amendment apply to the computation of the unused excess profits credit when a taxpayer was on a fiscal year basis, it used plain and specific language to accomplish those purposes. For example, Section 710 (c) (2) of the Code provides that for the purpose of the unused excess profits credit, the excess profits credit and the excess profits net income for any taxable year beginning in 1940 shall be computed under the law applicable to taxable years beginning in 1941. Section 710 (c) (2) [as amended by Revenue Act of 1945, section 122 (c)] provides further that the unused excess profits credit for a taxable year beginning in 1946 and ending in 1947 shall be an amount which is such part of the unused excess profits credit determined under the preceding portions of that paragraph as the number of days in such taxable year prior to January 1, 1947 is of the total number of days in such taxable year.

"It thus appears that when Congress intended that the computation of the unused excess profits credit for any fiscal year should be computed under provisions of the statute other than those in effect at the beginning of the year, it used clear language to accomplish that purpose. Congress did not so provide in the case of the computation of the unused excess profits for a taxable year beginning in 1943 and ending in 1944, and there is nothing to indicate that it so intended. Therefore, there is no support for the respondent's attempt in this case to reduce the petitioner's excess profits credit carry-over by a statute which was not in force at the beginning of the taxable year and which was not intended to apply to such carry-over." [Petitioner's brief.]

If it is true, as is argued by the petitioner, that Congress has not *expressed* any intention that the unused excess profits credit for a fiscal year ending in 1944 should be determined to any extent under the amended provisions of section 714 of the 1939 Code, the position of the petitioner would seem clearly to be sustained by section 201 of the Revenue Act of 1943, providing that the amendments upon which the respondent here relies "shall be applicable only with respect to taxable years beginning after December 31, 1943."

Beyond question, the taxable year here involved did not begin after December 31, 1943. Superficially, therefore, the petitioner's contention that the amended statute has no application here would seem to be impregnable. Closer analysis, however, leads us to the contrary conclusion.

The excess profits credit prescribed by section 714 has no purpose or significance except as it enters into a computation of tax liability under section 710, either for the current taxable year or for a prior or subsequent period. Therefore the provisions of section 710 (a) (6), which require two tentative tax computations for a fiscal year falling within the two calendar years, 1943 and 1944, in substance and effect provide *expressly* that such a fiscal year shall have not one excess profits credit but two different excess profits credits, one determined under the law applicable to 1943 and another determined under the law applicable to 1944.

It is therefore impossible to find any *single* credit which conforms to the specification of "the excess profits credit" for this taxable year, such as is the basis of the determination of the unused credit defined by section 710 (c) (2). Thus the present controversy clearly appears in its true light to involve a statute which is essentially ambiguous and which, if applied to the present situation without the aid of construction, would be obviously inconsistent and contradictory.

This problem can be solved only by a construction which will find the essential meaning expressed in the particular words used in the statute, in the light of the legislative purpose and intention as demonstrated by the background of the ambiguous provision and the context of the statute as a whole.

There can be no doubt of the general legislative purpose to treat fiscal years such as are here involved as if they were in part governed by one statute and in part governed by another, in proportion to the number of days falling within each of the two calendar years. The absence of any specific statutory provision governing the determination of the credit or the unused credit for a 1944 fiscal year may probably be attributed to oversight rather than design. Nevertheless, it must now be decided whether or not the language of the particular sections which are here controlling requires or permits the conclusion

that section 203 of the Revenue Act of 1943, amending section 710 (a) by adding paragraph (6), "expressly" provides that the amended section 714, notwithstanding section 201 of the 1943 act, "shall be applicable" to this taxable year beginning before December 31, 1943.

This result can be sustained only if section 710 (c) (2) may be so construed that the terms "the excess profits credit" for this taxable year describe, in effect, a composite credit reflecting a proportionate part of each of two credits, of which one would be used in the computation of one tentative tax, if the income had been large enough to be taxable, and the other would have been used in the computation of another tentative tax under appropriate circumstances.

This is, of course, the position which the respondent urges in this case. It may be further clarified by the following figures:

| | | |
|---|---:|---:|
| Credit determined under "1943 law" | $1,407,068.21 | |
| $31/366$ thereof | | $119,158.28 |
| Credit determined under "1944 law" | 1,247,556.84 | |
| $335/366$ thereof | | 1,141,889.73 |
| "The credit" for the fiscal year: | | |
| (1) As computed by proration, as above | | 1,261,048.01 |
| (2) As claimed by the petitioner (under "1943 law") | | 1,407,068.21 |
| (3) As determined (in effect) by the respondent: | | |
| Excess profits net income | 1,067,200.66 | |
| Unused credit | 193,866.71 | |
| Total credit | | $1,261,067.37 |

Since 2 different credits for the fiscal year 1944 must be used in the tax computation expressly prescribed by section 710 (a) (6) of the Code, we conclude that Congress did expressly provide that section 714 as amended by the Revenue Act of 1943, in combination with section 710 (a) (6) as enacted by that statute, should govern the computation of the unused excess profits credit for such a fiscal year. Therefore, notwithstanding section 201 of the 1943 act, the 2 credits must also be used in appropriate proportions in the determination of the unused credit for such a fiscal year.

It is true that nowhere in the statute is there any description of an excess profits credit for this fiscal year which meets the foregoing description of a "composite" credit. It is also true that the amount of such a composite credit has never been used by this taxpayer for any tax purpose nor by the respondent in his determination, and would not appear as such even in the tentative computations which would have been required if the taxpayer's excess profits net income for the fiscal year had been subject to tax. On the other hand it is equally clear that by means of the prescribed computations the excess profits tax liability for such a fiscal year is determined "as if" each of the 2 amounts of taxable income and credit and the various tax rates were

reduced to composite figures, in proportion to the 2 periods of time. The only difference is that instead of reducing a number of factors to proportionate components and employing a number of composites, the statute prescribes the use of the entire factors to arrive at 2 tentative tax results, which are then reduced in the same proportions and combined into a single composite.

In our opinion this is equivalent to an express provision to the effect that the excess profits credit for this fiscal year is the composite amount, and that only this composite can properly be used in the determination of the unused excess profits credit for the fiscal year 1944 which may be carried over to the fiscal year 1945.

Our conclusion is supported by the fact that the avowed purpose of Congress in enacting the excess profits tax provisions of the Revenue Act of 1943 was to produce additional revenues. See H. Rept. No. 871, 78th Cong., 1st Sess., 1944–1 C. B. 901, et seq. As argued by the respondent, in the light of this purpose

It is inconceivable that Congress intended to discriminate between fiscal year and calendar year taxpayers, by allowing fiscal year taxpayers the benefit of a larger [unused] credit under the prior law. If the petitioner's contention were to be adopted, calendar year [1944] taxpayers would receive less [unused] credit under the new law than would fiscal year taxpayers.

Petitioner argues that this conclusion is opposed to the statement in the cited report, that the effect of the 1943 legislation upon excess profits credit carry-overs was given "careful consideration" and would receive further study, but that the conclusion was that "it was not possible to suggest changes in these credits, carry-overs, and carry-backs at this time."

It is true that the effect of our decision will be that the excess profits credit carry-over of this petitioner will be reduced below the amount which it would have enjoyed had there been no enactment of the 1943 act. We do not believe, however, that this result is at all in conflict with the quoted statement of the legislative intention. The result here reached represents merely the logical application of the legislative action to a secondary consequence of the reduction of the excess profits credit. The quoted statement, in our opinion, did not indicate any legislative intention that the reduction in the credit should not correspondingly reduce the unused credit carry-over, but referred only to substantial or structural changes directly modifying the scheme of carrying over unused credits, upon which action had been deferred.

Both parties claim support from the case of *North Carolina Lumber Co.*, 19 T. C. 587, 594–595 (1952), but we regard that decision as inapplicable here. There the taxpayer claimed the benefit of an exclusion from income subject to the declared value excess-profits tax, under section 510 of the Revenue Act of 1943. That section, however, was expressly declared, without exception, to be "applicable to taxable

years beginning after December 31, 1943." The taxable year of the taxpayer began, as in this case, on December 1, 1943. Nevertheless, contended the taxpayer, the statute should be applicable upon the proration formula contained in the 1939 Code, section 108 (b), which was added to the Code by section 108 of the Revenue Act of 1943. That section prescribed the formula only with specific reference to other taxes, imposed under enumerated sections other than section 600 of the 1939 Code by which the declared value excess-profits tax was imposed. The Court held that the declared value excess-profits tax for a fiscal year was not to be determined by a formula which was expressly applicable only to other taxes. This holding does not indicate whether or not a formula prescribed for the computation of the excess profits tax is also applicable to the determination of the credit allowed for the same year with respect to the same tax.

The present question is perhaps more analogous to that decided by *C. Ray Novak*, 11 T. C. 341 (1948), cited in the preceding case. There the Court held, upon the ground that the tax computed under the tax table as provided by the 1939 Code, section 400, was "in lieu of the tax imposed by sections 11, 12, and 450," that for the fiscal year 1944, there involved, the tax might be computed under section 400 even though that taxable year was specifically governed by Code section 108 (b) which referred to sections 11, 12, and 450 but made no provision for applying section 400.

The second issue concerns the character of a net loss sustained by the petitioner during its fiscal year 1946 from the sale of certain parcels of real estate. The nature of this loss depends upon the purpose for which the property was held by the petitioner.

The petitioner contends that the statutory limitations upon the deduction of capital losses are inapplicable because the real property sold was held by it primarily for sale to customers in the ordinary course of its trade or business, and was therefore excluded from the statutory definition of "capital assets." [3] The respondent bases his opposing argument upon our holding in the case of *Kanawha Valley*

---

[3] Internal Revenue Code of 1939.

SEC. 117. CAPITAL GAINS AND LOSSES.
    (a) DEFINITIONS.—As used in this chapter—
        (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; [As amended by Revenue Act of 1941, sec. 115 (b) and (c) ; Revenue Act of 1942, sec. 151 (a) and sec. 101.]

*Bank*, 4 T. C. 252 (1944), and his rulings made in accordance therewith. He contends that the losses here in question were capital losses because they resulted from sales of nonproductive property held by the petitioner for investment.

The position taken here by the petitioner is the same as that adopted by the respondent in G. C. M. 21497, 1939–2 C. B. 187, under the provisions of section 117 (b) of the Revenue Acts of 1934 and 1936. It was there held that a bank, mortgage finance company, or building and loan association which offers for sale parcels of real estate acquired by foreclosure is holding such foreclosed real estate primarily for sale to customers in the ordinary course of its trade or business.

In the light of the decision in the *Kanawha Valley Bank* case, *supra*, the respondent reconsidered this question and in G. C. M. 24910, 1946–1 C. B. 101, ruled that sales by lending institutions of property acquired through foreclosure would be treated as sales of capital assets, giving rise to capital gain or loss. This position was maintained by the respondent until 1951, when it was modified by G. C. M. 26690, 1951–1 C. B. 28. In view of the amendment of the statute in 1942, it was then held that real estate acquired by an institution such as the petitioner by deed in lieu of foreclosure and thereafter managed and rented for the purpose of reducing the loss thereby sustained would be regarded as real property used in the general trade or business of the financial institution. Such real estate would therefore be excluded from the definition of capital assets in the 1939 Code, section 117 (a) (1), and would be subject to the tax consequences prescribed by Code section 117 (j) if held for more than 6 months. Nonproductive properties held for investment purposes were excepted from this ruling, and it was expressly reaffirmed that all properties so acquired and held were still regarded as not held primarily for sale to customers in the ordinary course of the trade or business.

In the case of *Kanawha Valley Bank*, *supra*, involving a taxable year 1940, the Court said (4 T. C. at p. 256) :

We think it unreasonable to conclude that petitioner forbidden by state law to carry on a real estate business, was actually engaged in that business and selling real estate to customers in the regular course thereof, merely because it had acquired and sold three parcels of real estate over a period of two years, the transaction in each instance being an incident to the collection or recovery of money loaned by it in the transaction of its regular banking business. We think that the three parcels of real estate here involved were capital assets in petitioner's hands within the purview of section 117 (a) (1), *supra*. *Thompson Lumber Co.*, *supra*, [43 B. T. A. 726 (1941)].

By the decision in *Kanawha Valley Bank*, *supra*, the Court rejected the Commissioner's contention that in all cases real estate acquired by a bank in foreclosure must be considered as held by it primarily for sale to customers in the ordinary course of the trade or business of the

bank. The respondent now argues that in all such cases involving nonproductive real estate the contrary rule must be applied because of that decision.

We can not agree that any such rule was adopted by that case or should now be recognized. Later decisions compel the conclusion that the issue here presented is one of fact, which can be decided only upon consideration of all the circumstances bearing upon the compliance with the statutory requirements. *Lawyers Title Co.*, 14 T. C. 1221 (1950); *Mauldin* v. *Commissioner*, (C. A. 10, 1952) 195 F. 2d 714, affirming 16 T. C. 698 (1951); *Albert Winnick*, 17 T. C. 538, 541 (1951), remanded for additional findings (C. A. 6, 1952) 199 F. 2d 374, supplemental decision 21 T. C. 1029.

The *Kanawha Valley Bank* decision may be regarded as correct in view of the facts presented and as applicable only to similar situations. It referred to an "established practice" but there was no finding of any specific transactions other than three sales made within the taxable year. The decision may also be regarded as limited by the finding that the taxpayer was "not permitted under the laws of West Virginia to carry on a real estate business." For reasons suggested later herein, however, this finding may be deemed to conflict with the conclusion, stated in the Opinion in the same case, that the "statute permits the acquisition of real estate by a banking institution * * * as an incident of the satisfaction of debts" and requires that such properties "be disposed of at the earliest practicable date."

The decision in *Lawyers Title Co.*, *supra*, cited above, dealt with a similar situation in that it concerned a financial institution, and not a bank, which, in the hope of avoiding or reducing a threatened loss, acquired 35 real estate properties held as security in a single transaction. The Opinion states (14 T. C. at pp. 1227–1228):

> The petitioner originally became involved with the Rolla project in connection with its business of examining and insuring titles to real estate and acting as escrowee between lending institutions and builders. * * *
>
> Upon a full consideration of all the facts and circumstances surrounding petitioner's activity in relation to the Rolla project, we are convinced that the properties came into petitioner's possession as a necessary incident to the conduct of its business and that they were held and completed primarily for sale to customers in the ordinary course of its business. *Joe B. Fortson*, 47 B. T. A. 158. The fact that petitioner had not had occasion to follow this course of action before (so far as our record shows) does not prevent its being in the ordinary course of petitioner's business in the light of the surrounding circumstances. *Welch* v. *Helvering*, 290 U. S. 111.
>
> In any event, we think it is clear that the petitioner's activity in relation to the Rolla properties after it took title to them amounted to engaging in the real estate business. The facts that petitioner had no license to engage in the real estate business and that it apparently had not done so in the past are not determinative of the question of whether petitioner entered the real estate business when it acquired these properties. It took title to the properties, supervised

the completion of construction, rented some of the houses, and ultimately sold them all. Petitioner did not merely hold the property for sale as an investment when it acquired them. It actively engaged in improving and completing them, in the meantime deriving such revenue from them as it could until it managed to complete and sell them to such purchasers as it could find. We conclude that petitioner was engaged in the real estate business in the fullest sense from the time it acquired the Rolla properties. Cf. *Snell* v. *Commissioner*, 97 Fed. (2d) 891; *Ehrman* v. *Commissioner*, 120 Fed. (2d) 607; certiorari denied, 314 U. S. 668. * * *

The present case cannot be disposed of simply upon the narrow ground that the taxpayer is a bank or a lending institution selling property acquired by foreclosure or by deed in lieu of foreclosure. On the contrary, consideration must be given to other factors which have been recognized as significant. As stated in *Mauldin* v. *Commissioner, supra*, 195 F. 2d at page 716:

There is no fixed formula or rule of thumb for determining whether property sold by the taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business. Each case must, in the last analysis, rest upon its own facts. There are a number of helpful factors, however, to point the way, among which are the purposes for which the property was acquired, whether for sale or investment; and continuity and frequency of sales as opposed to isolated transactions. * * * [Citing and reviewing many decisions.]

Similar statements were made in the case of *Albert Winnick, supra,* 17 T. C. at pages 541–542, 544. Among other cases expressing and applying the same rule are: *Martin Dressen,* 17 T. C. 1443, 1447 (1952); *Thomas E. Wood,* 16 T. C. 213, 226 (1951); *W. T. Thrift, Sr.,* 15 T. C. 366, 369 (1950); *Boomhower* v. *United States,* 74 F. Supp. 997 (1947).

In the ordinary course of its business the petitioner frequently acquired real estate in foreclosure proceedings. The petitioner's sole objective with respect to this real estate, and its duty as a bank under the Pennsylvania statute, was to sell it as soon as possible at a fair price. To accomplish this result, the petitioner subdivided a large number of parcels into several hundreds of lots, laid out streets, put in pavements, sewers, and water pipes and in certain subdivisions financed the construction of a large number of dwelling houses, investing large amounts. It used the services of licensed real estate salesmen and brokers who were employed in its real estate and mortgage division. It circulated hundreds of brochures describing some of the properties which it was offering for sale. It listed such property with a number of brokers through multiple listing facilities and advertised extensively. The sales made by the petitioner in 1946 and prior years were numerous and the amounts realized were substantial, amounting in the fiscal year 1946 to $302,882.06. The purchasers were the "customers" of the petitioner. The activities of the petitioner were so extensive as to constitute a business. The real

estate was held primarily for sale to customers in the ordinary course of that business.

In reaching this conclusion we have attached very little significance to the stipulated evidence concerning the extensive activities of the real estate and mortgage division of the petitioner. It clearly appears that the activities of the real estate and mortgage division were primarily concerned with the properties of customers of the bank and estates and trusts of which it was a fiduciary. Only an almost negligible portion of those activities concerned the properties of the bank. The character of the bank's dealings in the 13 properties here involved cannot be characterized by reference to the activities of the bank concerning the properties of its customers. With respect to these specific properties, however, and also as to other properties similarly held during prior years, there is abundant evidence of continuous and extensive activity which in our opinion amounted to the conduct of a trade or business, in which the bank was clearly engaged in selling real estate to its customers.

We do not decide that the petitioner was a "dealer in real estate" in the fiscal year ended November 30, 1946. Although the petitioner urges and the respondent opposes such a conclusion, we do not consider it necessary to the decision of this case.

The issue is whether the real estate sold conformed to the statutory specification of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Without characterizing the business of the petitioner within any recognized category, we hold only that the real estate in question was held by the petitioner primarily for sale to its customers in the ordinary course of its trade or business as a bank engaged in acquiring real estate mortgages or making mortgage loans and attempting to realize upon the value of the security acquired upon foreclosure of such mortgages. As stated in *Carter Lumber Co.* v. *Commissioner*, (C. A. 5, 1944) 143 F. 2d 296, 297: "The management and administration of foreclosed property is an essential ingredient of the business of financing."

It is often stated that the words "to customers" and "ordinary" were inserted in section 117 (a) (1) by the Revenue Act of 1934 to express the purpose of Congress to allow only "dealers" to deduct from ordinary income losses sustained upon sales of property held primarily for sale. See *Thomas E. Wood*, *supra* (16 T. C. at pp. 219–220). It is only in the exceptional cases, however, where the property held for sale by a "dealer" would not constitute "stock in trade" or would not "properly be included in the inventory of the taxpayer," that "dealers" would be at all concerned with the further exclusion of "property held * * * primarily for sale to customers."

While the term "dealer" has not been authoritatively defined in this connection, it probably includes the requirement of buying as well as selling for purposes of profit. See the definition of a "dealer in securities" in Regulations 118, section 39.22 (c)–5, and prior regulations.

In this case the respondent strongly urges that since the petitioner never did purchase real estate to be sold at a profit, and under the banking law was prohibited from doing so, it necessarily was not a dealer and therefore is not entitled to the deductions claimed. In many cases, however, without discussion of this point, the deduction has been allowed where neither the property in question nor any other property had been purchased for resale, as by a dealer. It has been emphasized, as in the case of *Albert Winnick, supra,* 17 T. C. at 543:

There may be a change of intent between the time of acquisition and the time of sale, and if property originally acquired for investment is held in the taxable year primarily for sale to customers in the regular course of trade or business, the gain realized in the taxable year is not subject to capital gain treatment. This conclusion is based on the language of section 117 which, in the definition portions of both subsections (a) and (j), speaks of "property held by the taxpayer" rather than property "acquired" or "purchased." *Richards* v. *Commissioner,* 81 F. 2d 369. * * *

But compare *McGah* v. *Commissioner,* (C. A. 9, 1954) 210 F. 2d 769, reversing 17 T. C. 1458 (1952), decided upon remand by 193 F. 2d 662 (C. A. 9, 1952), vacating 15 T. C. 69 (1950).

In *Mauldin* v. *Commissioner, supra,* it is stated by the Court of Appeals for the Tenth Circuit (195 F. 2d at p. 717) :

While the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which it was held. Rollingwood Corp. v. Commissioner, 9 Cir., 190 F. 2d 263.

Admittedly, Mauldin originally purchased the property for purposes other than for sale in the ordinary course of trade or business. When, however, he subdivided and offered it for sale, he was undoubtedly engaged in the vocation of selling lots from this tract of land at least until 1940. * * *

To the same effect is *Brown* v. *Commissioner,* (C. A. 5, 1944) 143 F. 2d 468, affirming a Memorandum Opinion of this Court, holding that land was property held primarily for sale to customers in the ordinary course of the trade or business, where it was subdivided and sold by a widow after having been for several years held as community property and used for grazing cattle.

See also *Ehrman* v. *Commissioner,* (C. A. 9, 1941) 120 F. 2d 607, 610, affirming 41 B. T. A. 652 (1940), certiorari denied 314 U. S. 668 (1941).

The respondent relies upon the statutory prohibition against the purchase and sale of real estate by this petitioner under the banking

laws of Pennsylvania, Purdon's Pennsylvania Statutes Annotated, 1939, title 7, section 819–1014. This statute provides:

A. Except as otherwise provided in this act, a bank, a bank and trust company, or a trust company shall not purchase, own, or hold any real property, except as follows:

\* \* \* \* \* \* \*

(2) Such as it shall purchase at sales under judgments, decrees, or mortgages held by it, or as it shall otherwise acquire in good faith in satisfaction of debts previously contracted to it, or in order to protect an interest it may otherwise have lawfully acquired in such property.

It is further provided that any such real estate shall not be owned or held "for a period longer than five years after the acquisition of such real property," except upon permission granted pursuant to application. The statute also states:

This section shall not be construed to prevent any bank, bank and trust company, or trust company from making improvements to properties owned, but not occupied by the bank, the bank and trust company, or the trust company, for the purposes of sale or lease.

The language of this statute seems clearly to sustain the contention of the petitioner that it permits the transactions here involved. Since it imposes upon the bank a positive duty to sell such property within a 5-year period, as extended, and expressly contemplates improvements for purposes of sale or lease, it clearly implies that the bank was authorized and obligated to make such sales only after taking all reasonable means of assuring the realization of the reasonable value of the property.

It is stated in G. C. M. 26690, *supra*, that the common statutory restrictions upon the purchase of real estate by banks should not "preclude an examination of a bank's real estate activities in order to determine, as a question of fact, whether the property is used in the business of banking." Neither should they preclude a determination that property is sold to customers in the ordinary course of the business of the bank.

The limitations upon the deduction of capital losses would be avoided in this case if the property sold should be regarded as "real property used in the trade or business of the taxpayer." Such property is excluded from the definition of capital assets in Code section 117 (a) (1) and is the subject of special treatment under the provisions of section 117 (j), which was added to the Internal Revenue Code by section 151 (b) of the Revenue Act of 1942. Property held primarily for sale to customers in the ordinary course of the trade or business of the taxpayer is excluded from section 117 (j), as well as from section 117 (a) (1).

The petitioner has not referred to section 117 (j) in support of its position, which we sustain entirely under section 117 (a) (1). While

we therefore make no decision with respect to section 117 (j), we may point out that the respondent seems to have conceded a substantial portion of the petitioner's claim upon the ground that some of the losses were deductible as ordinary losses under that section.

It may be noted that Code section 117 (j) was not applicable to the taxable year 1940 which was involved in the case of *Kanawha Valley Bank, supra,* and that the Opinion in that case does not refer to that statute, although it had been enacted 2 years earlier. The modification of the respondent's rulings in 1951 because of section 117 (j) has been noted above.

In accordance with G. C. M. 26690, *supra,* the respondent argues in this case that 8 specified properties here involved were not excluded from section 117 (a) (1) as "real property used in the trade or business," and consequently were not covered by section 117 (j), because they were not income producing property and therefore must be deemed to have been held by the bank for investment purposes.

The respondent's enumeration of such properties includes 3 from which some rental income was derived, as shown in our Findings of Fact, being the properties there referred to as Tredyffrin Country Club, Melrose Country Club, and King of Prussia Road. In view of the small amount of the rental income and the small fractional interest of the petitioner therein, the respondent asserts that these properties must be regarded as "nonproductive."

From this category of nonproductive property held for investment, the respondent omits not only the North Broad Street and the 1604 Walnut Street properties, from which rental income was derived, as shown by our findings, but also the property referred to as Chatham Village, the property in Merion, and another property referred to as Mayfair which is not mentioned in our findings. According to the stipulation, these 3 properties were not "rental or income producing properties."

The respondent, therefore, seems to recognize that there are 5 properties which, being omitted from his enumeration of "nonproductive" properties "held for investment purposes," are governed by section 117 (j). If so, the respondent apparently concedes that the losses upon these properties, aggregating $24,287.44, are deductible as ordinary losses under section 117 (j), under the rule stated in G. C. M. 26690, *supra,* as follows:

The financing of loans and foreclosing of mortgages constitute an integral part of the banking business. In general and in the absence of any facts to the contrary (such as nonproductive property held after foreclosure for investment purposes), real property acquired by foreclosure should be considered as used in the trade or business of the lending institutions.

Under this view, and excluding the loss of $248,659.46 upon the Black Farm property, upon the remaining 7 properties the petitioner

realized a net capital gain of $2,366.85. Our decision, however, does not to any extent rest upon this apparent concession by the respondent.

Reviewed by the Court.

*Decision will be entered under Rule 60.*

VAN FOSSAN, MURDOCK, and WITHEY, *JJ.*, concur in the result.

