George M. Bernard and Mary A. Bernard v. Commissioner. Edwin A. Rezendes and Rosa A. Rezendes v. Commissioner.
Bernard v. Commissioner
Docket Nos. 6845-65, 6847-65.
United States Tax Court
T.C. Memo 1967-176; 1967 Tax Ct. Memo LEXIS 84; 26 T.C.M. (CCH) 858; T.C.M. (RIA) 67176; August 29, 1967
John L. Flynn, P.O. Box 615, Ashland, Ore., for the petitioners. Merritt S. Yoelin, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases the respondent determined the following income tax deficiencies against the petitioners: Defi-
Petitioners
Year
ciency
George M. and Mary A. Bernard
1962
$8,990.58
Edwin A. and Rosa A. Rezendes
1962
7,292.49
Some issues have been conceded by the parties and will be given effect in the Rule 50 computations. The issue for decision is whether certain real property received in an exchange with the intent to sell it to a third party concurrently with the execution of the exchange, and actually sold 2 weeks after the completion of the exchange, was acquired to be held and was held by the petitioners primarily for sale within the provisions of section 1031(a)[1] so that the gain realized is recognized in the year of the exchange. Findings of Fact Many of the facts have been stipulated by the parties. The stipulation of facts and exhibits *86 attached thereto are incorporated herein by this reference. George M. Bernard and Mary A. Bernard are husband and wife whose legal residence at the time of filing the petition in this proceeding was Novato, California. They filed their joint Federal income tax return for the year 1962 with the district director of internal revenue at San Francisco, California. Edwin A. Rezendes and Rosa A. Rezendes are husband and wife whose legal residence at the time of filing the petition in this proceeding was Beatty, Oregon. They filed their joint Federal income tax return with the district director of internal revenue at San Francisco, California. George M. Bernard and Edwin A. Rezendes were equal partners in a partnership known as Rezendes and Bernard. The partners are related by blood or marriage to each other. The partnership, located in Modesto, California, maintained its accounting records on a fiscal year basis, beginning March 1 and ending February 28. Returns for the partnership's fiscal years ending February 28, 1962, and February 28, 1963, were filed with the district director of internal revenue at San Francisco, California. The partnership was formed on March 28, 1948. During *87 that month it acquired approximately 78 1/2 acres of land near Modesto, California, (hereinafter referred to as Tract A). A building which was located on Tract A was used by the Bernards as their personal residence from March 1948 to November 1, 1961. During April 1959, the partnership acquired 41 acres of land (hereinafter referred to as Tract B). A building which was located on Tract B was used by the Rezendes as their personal residence. Tract A is located on California Avenue. Tract B is situated directly across the road on California Avenue from Tract A. The approximate distance between the city limits of Modesto and Tracts A and B is 6 1/2 to 7 miles. Kenneth R. and Annamay Dufton (hereinafter referred to as the Duftons) owned a 50 acre tract of land with a residence thereon (hereinafter referred to as Tract C). The city limits of Modesto were, in 1961, within three-quarters of a mile from Tract C. The approximate distance between Tract C and Tracts A and B is 12 miles. The Duftons' primary use of Tract C was as a Grade B dairy farm. There were also 13 acres of almond trees planted on Tract C. Gordon Snyder (hereinafter referred to as Snyder) is a licensed real estate *88 broker in California. In early 1961, the individual who owned the property across the street from Tracts A and B informed Snyder that the partners were interested in selling their properties. At that time the partners intended to liquidate their entire holdings in the Modesto area. Bernard intended to move to the Coast. Rezendes intended to invest the proceeds in other property. During the early months of 1961, Snyder and the partners discussed the prospects of selling Tracts A and B. The partners indicated to Snyder their desire to sell Tract A. These discussions resulted in the partners granting Snyder a 90-day exclusive listing to sell Tract A. In accordance with that agreement, Snyder vigorously attempted to locate a purchaser for Tract A and offered Tract A for sale in several advertisements which appeared in the Modesto newspapers. Snyder solicited and located many prospective purchasers for Tract A within the period encompassed by the 90-day exclusive listing and showed the parcel several times. The exclusive listing agreement expired around June 10, 1961, without a definite commitment for the purchase of Tract A. Since a sale had not been consummated during the 90-day exclusive *89 listing, an open listing agreement for the sale of Tract A was granted to Don Fraser of Wolverine Realty, Snyder and one other broker. Pursuant to this agreement, advertisements of Tract A were placed in the Modesto newspapers by Wolverine Realty. Snyder had approached the Duftons concerning the sale of Tract C prior to the receipt of the exclusive listing for the sale of Tract A. The Duftons were aware of the growth of Modesto and that Tract C's use as a subdivision would force its sale in the near future. They also sought a larger pracel of land on which to continue their business. However, the Duftons were not willing to sell Tract C until replacement property could be located. Through an advertisement placed by Wolverine Realty pertaining to Tract A, Dufton discussed and inspected the parcel with Don Fraser. After Dufton telephoned Snyder and expressed an interest in Tract A, Bernard was approached in an effort to commence negotiations. Since the partners only wanted to sell their properties prior to the negotiations with the Duftons, there had been no discussion of an exchange of properties and a concurrent sale of the property received by the partners. During the negotiations *90 between the partners and the Duftons, Snyder located a contractor, Bill Mineni, who expressed an interest in purchasing Tract C for use as a subdivision. Snyder informed the partners of this development prior to their agreeing to the exchange of Tract A for Tract C. During the negotiations, Dufton informed the partners that he was only interested in an exchange of the properties, and that he would not consider the purchase of Tract A or the sale of Tract C in separate transactions. Likewise, the partners were willing to exchange Tract A for Tract C instead of an outright sale of Tract A, only if Snyder could produce a ready buyer for Tract C. The partners determined that the exchange and sale would be a convenient method of disposing of Tract A and Tract C, furthering their expressed intention of liquidating their property interests near Modesto. It was contemplated that the exchange, and sale which was to be made directly to Mineni by the partners, would be one transaction. At the request of the parties, Snyder prepared an agreement of exchange dated July 18, 1961, providing for the transfer of Tract A, plus certain specified farm equipment, to the Duftons. Tract C was to be conveyed *91 to the petitioners. The agreement of exchange dated July 18, 1961, contained the following paragraph: It is agreed and understood that this Exchange Agreement is made subject to and contingent upon a bonified and satisfactory sale of the property described in Paragraph Two [Tract C] of this agreement now belonging to the parties of the first part [Duftons]; the minimum sales price of the above-mentioned property shall not be less than $162,500.00. The figure $162,500.00 was crossed out and $152,000.00 inserted in its place. This contingency provision was inserted in the agreement of exchange at the request of the partners because they wanted to sell Tract C at the same time that the exchange was completed so that they would not be required to hold Tract C. The partners did not intend to use Tract C in the furtherance of their farming operations. Their sole intention was to sell Tract C contemporaneously with the completion of the exchange. Pursuant to the agreement of exchange dated July 18, 1961, Snyder's commission was to be $14,000. Of this amount, the Duftons were to pay $7,500 and the partners $6,500. On August 22, 1961, the agreement of exchange dated July 18, 1961, was *92 modified by the execution of a new agreement. Dufton lowered his price from $162,000 to $152,000 and Snyder's commission was adjusted to $12,000 payable in full by the partners. On August 22, 1961, the Duftons and the partners executed Escrow Instructions Nos. 160-691-T and 160-692-T to Security Title Insurance Company concerning the exchange of Tract A and Tract C. The following paragraph was included in the agreement of exchange dated August 22, 1961: It is agreed and understood that this Exchange Agreement is made subject to and contingent upon a bonified and satisfactory sale of the property described in Paragraph Two [Tract C] of this agreement, now belonging to the parties of the first part [Duftons]. Escrow Instruction No. 160-691-T contained the following clause: It is agreed between the parties hereto that the completion of this transaction is contingent upon sellers' [partners] making a satisfactory sale of property described in Escrow No. 160-692-T [Tract C]. The following clause appeared in Escrow Instruction No. 160-692-T: It is agreed between the parties hereto that the completion of this transaction is contingent upon purchasers' [partners] making *93 a staisfactory [satisfactory] sale of this property [Tract C]. At the time the agreement of exchange dated August 22, 1961, was executed, Snyder was still negotiating the sale of Tract C with Bill Mineni and other individuals. Snyder kept the partners informed of these continuing negotiations. Shortly before September 13, 1961, it was learned that Bill Mineni was unable to raise the money to purchase Tract C from the partners. Nevertheless, the partners agreed to complete the exchange and it became necessary to remove the contingency provisions from the agreement of exchange dated August 22, 1961. On September 13, 1961, the contingeny clause was crossed out from the August 22, 1961, agreement of exchange and Escrow Instructions Nos. 160-691-T and 160-692-T. The partners agreed to the striking of the contingency provision in the August 22, 1961, agreement of exchange in reliance upon Snyder's assurance that he would be able to locate a purchaber of Tract C prior to the removal of the crops on October 15, 1961. Snyder determined he would be able to find a purchaser for Tract C in a very short period of time as it was readily salable for subdivision purposes. When the contingency *94 clause was crossed out of the August 22, 1961, agreement of exchange, the following clause was added: However, no commission will be paid until the property described in Paragraph No. 2 [Tract C] has been sold and 20 per cent has been paid. Snyder agreed to defer receipt of his commission since, as part of the original agreement, he was to have a ready and willing purchaser for Tract C. This was simply an extension of the original agreement. When the contingency provision was crossed out, the partners instructed Snyder to continue his search for a buyer for Tract C. He followed those instructions by contacting three or four prospective purchasers. Since the Tract C was prime subdivision property, the individuals contacted were subdividers and home builders. Snyder also agreed to defer receipt of his commission because Tract C was readily salable at any time for subdivision property and he knew that he would not have to wait for too long a period to realize his commission. The partners never intended to use Tract C for farming, but intended to sell it as soon as possible. On October 13, 1961, the Duftons executed a minor and immaterial amendment to Escrow Instruction No. 160-692-T. *95 Security completed and closed the escrows, numbered 160-691-T and 160-692-T, pursuant to the terms of the instructions on November 1, 1961. The fair market value of Tract A on November 1, 1961, was $152,000 which was equal to the fair market value of Tract C as of November 1, 1961. During the first part of November 1961 and after the exchange had been completed, Snyder actively sought a purchaser for Tract C as instructed to do so by the partners. Snyder contacted John Kirkpatrick in November 1961 attempting to interest him in Tract C. Immediately thereafter, Kirkpatrick called Snyder indicating his willingness to make an offer on the property. Snyder proceeded to expose that offer to the partners. Within a very short period thereafter, the partners delivered an "Agreement and Escrow Instructions" to Security concerning the sale of Tract C to Kirkpatrick for the sum of $158,800. On November 16, 1961, pursuant to paragraph 1 of the "Agreement and Escrow Instructions," Kirkpatrick delivered a check to Snyder in the amount of $1,000 which was deposited with Security. John H. Kirkpatrick has paid the following amounts to Security pursuant to the "Agreement and Escrow Instructions": *96 Date of Payment
Amount
November 16, 1961
$ 1,000.00
April 3, 1962
19,000.00
April 17, 1962
5,000.00
January 28, 1963 *
7,466.62
February 11, 1963
13,585.38
February 19, 1964
38,400.00
December 21, 1964
23,676.80
November 30, 1965
34,528.00
After the exchange between the partners and the Duftons was completed, Bernard resided on Tract C. The partners farmed Tract C during 1962 because Kirkpatrick needed someone to keep it cleaned up and some crops were available. Thereafter, and until 1964, Rezendes maintained Tract C individually in an effort to keep the area cleaned up for Kirkpatrick. The token farming of Tract C was incidental to the partners' principal interest of disposing of all their property interest in the Modesto area. The following comment appears on the partnership return for the fiscal year ending February 28, 1963: Note: This is the final partnership return. Edwin A. Rezendes is operating the farm in March, 1963 and thereafter by himself as an individual. The 41 acres of land, [Tract B] residence, barn and irrigation pipe line are still in partnership's name and will continue to be until *97 the property is sold. Liquidation of the Modesto properties was completed in 1964, when Tract B was sold. It was impossible for Rezendes, as an individual or as a partner, to support his family from farming Tract B. There was never any attempt to support either of the partners' families from farming Tract C. Pursuant to the "Agreement and Escrow Instructions," Kirkpatrick began subdividing and building homes on areas of Tract C in 1962. Bernard moved from Tract C to Novato, California, which is 25 miles north of San Francisco, California, in March 1963. During 1962, Bernard was employed by, and reported wages from, Louis W. Moreas, a building contractor. Moreas, who constructs homes in the Novato area, began building a residence for Bernard in 1962. Bernard assisted Moreas in the construction of this residence and received compensation for his services. During the period in 1962 that Bernard was employed by Moreas, he worked 40 hours per week. During that same period, Bernard commuted between Novato and Modesto on a daily basis, a one-way distance of 120 miles. Bernard, who is now engaged in building construction, has not been employed by anyone other than Moreas since he left *98 Modesto. Included in the property transferred by the partners to the Duftons was certain used farm equipment. The parties to that agreement did not place a value thereon. Petitioners and respondent have agreed that this equipment is to be treated similar to, and as part of, the real property in determining the gain to be recognized on the exchange. In his notices of deficiencies respondent determined that long term capital gain realized on the exchange of the two parcels of real property must be recognized in the taxable year 1962 rather than being deferred under section 1031(a) as claimed by petitioners both in their partnership return for the taxable year ended February 28, 1962, and in their individual returns for 1962. Ultimate Finding Tract C was acquired by the petitioners to be held and was held by them primarily for sale. Opinion The narrow issue we must resolve is whether the exchange qualified as a nontaxable exchange under the provisions of section 1031(a)[2] which allows nonrecognition of the gain realized in an exchange of solely "like kind" properties. Section 1031 (a) does not apply if either the transferred property or the property received was "held primarily *99 for sale." Nor does the statute require that the taxpayer carry on a trade or business with respect to the sale of the properties. Rezendes and Bernard formed a partnership in 1948. They purchased a 78 1/2 acre parcel of land (Tract A) located near Modesto, California, and later acquired a 41 acre parcel (Tract B) directly across the road from Tract A. In early 1961, the partners decided that their holdings near Modesto should be sold and liquidated. This fact became known to Gordon Snyder, *100 a licensed real estate broker. Snyder, who secured a 90-day exclusive listing agreement for the sale of Tract A from the partners, worked diligently and advertised the property for sale several times in the Modesto Bee newspaper. When the exclusive listing expired and a purchaser had not been located, the partners offered the property for sale under an open listing arrangement. Answering an advertisement placed in a Modesto paper under the open listing, Kenneth R. and Annamay Dufton became interested in Tract A. The Duftons owned a 50 acre parcel of real property (Tract C) located within threequarters of a mile from the city limits of Modesto. Dufton, through Snyder, approached the partners with a proposal to exchange Tract A for Tract C. The partners were willing to enter into such a transaction only if they could be assured that Tract C would be sold to a third party as part of the same transaction. When Snyder informed the partners that he had located a prospective purchaser for Tract C, an agreement of exchange was executed. However, that agreement, dated July 18, 1961, was contingent upon and subject to a bona fide and satisfactory sale of Tract C by the partners to a third party *101 as part of the exchange transaction. This contingency provision, which was inserted at the request of the partners, also appeared in a modified agreement of exchange dated August 22, 1961. When it was learned that the prospective purchaser of Tract C was not able to secure financing, the contingency provision was crossed out and Snyder agreed to defer receipt of his commission until Tract C was sold to a third party. The partners instructed Snyder to continue searching for a buyer after being assured that it would neither be difficult nor take too long to locate a purchaser. Snyder was able to give that assurance since Tract C was prime subdivision land. Within 2 weeks after the exchange was completed, Snyder did produce a buyer and Tract C was sold on November 16, 1961, for $158,800. Petitioners contend that the exchange of Tract A for Tract C qualifies as a nontaxable exchange under section 1031(a). Under their theory the gain realized on the exchange is not recognized and the adjusted basis and holding period of Tract A carry over to Tract C, under section 1031(d) and section 1223(1), respectively. The gain realized on the sale of Tract C is then reportable on the installment *102 basis under section 453(b)(2). Respondent counters with the contention that Tract C was acquired to be held and was held primarily for sale. As such, it is specifically excluded from section 1031(a) as the type of property which may be exchanged without recognition of gain. Since 100 percent of the "selling price" was received in the form of Tract C in the year of the exchange, respondent argues that petitioners cannot avail themselves of the installment method of reporting the gain realized on exchange of Tract A under section 453 and any further gains resulting from the sale of Tract C are to be taxed under the provisions of section 1002. Respondent relies on Malat v. Riddell, 383 U.S. 569 (1966); Regals Realty Co. v. Commissioner, 127 F. 2d 931 (C.A. 2, 1942), affirming 43 B.T.A. 194 (1940); and Ethel Black, 35 T.C. 90 (1960). Since section 1031(a) constitutes an exception to the general rule that gain or loss realized upon the sale or exchange of property is to be recognized, section 1.1002-1(b), Income Tax Regs. *103 , provides: The exceptions from the general rule requiring the recognition of all gains and losses, like other exceptions from the rule of taxation of general and uniform application, are strictly constructed and do not extend either beyond the words or the underlying assumptions and purposes of the exception. And section 1.1002-1(c), Income Tax Regs., provides: "The underlying assumption of these exceptions is that the new property is substantially a continuation of the old investment still unliquidated." See Ethel Black, supra at p. 94. Property held for productive use in a trade or business or for investment which is exchanged solely for property of a "like kind," as defined in section 1.1031(a)-1(b), Income Tax Regs., to be held either for productive use in a trade or business or for investment, are the categories of property that receive the exceptional treatment of section 1031(a). However, that section excludes, inter *104 alia, stock in trade or other property held primarily for sale from the classification of property held for productive use or investment. It is clear that Tract C was not stock in trade of the partnership and that the partnership was not in the business of buying or selling real estate at any time. However, it is equally clear that Tract C was to be "held primarily for sale" by the partnership when it was acquired and during the extremely short period during which it was held by the partnership thereafter. In this regard we note that respondent has not considered Tract A or Tract C as property held primarily for sale to customers in the ordinary course of the partnership's trade or business. In fact, the character of the income, reported as capital gains by the partnership, has not been questioned by the respondent. His only contention is that the gain realized on the exchange cannot be deferred under section 1031(a). This distinction was succinctly pointed out in our opinion in Ethel Black, supra, as follows (p. 96): In the instant case, we are dealing with an entirely different statute, namely, section 1031, and as to that section the words "for sale to customers *105 in the ordinary course of" the taxpayer's trade or business are quite conspicuous by their absence. For the exception in section 1031 to apply, there is no requirement that the taxpayer be conducting a trade or business, or that the property in question be held "for sale to customers in the ordinary course of" a trade or business carried on by the taxpayer. There can be no question, we think, that had it been intended that the scope of the exception in section 1031 should be so limited, language comparable to that used in the capital gains provisions, and which was in question in Loughborough Development Corporation, would likewise have been used in section 1031. The only requirement for applicability of the exception in 1031 is that the property received in exchange be "held primarily for sale." In its opinion in Malat v. Riddell, supra, the Supreme Court concluded that the word "primarily" meant "of first importance" or "principally." While the Malat case was concerned with one of *106 the exceptions to the capital gain provisions which uses the same term, its rationale is nevertheless applicable to section 1031(a). Whether Tract C was "held primarily for sale" is entirely a factual question which requires consideration of the facts surrounding the exchange, the principal or primary purpose for which the property acquired on the exchange was to be held, the use of the property during its holding period, and the principal or primary purpose for which the property so acquired was held at the time of its sale. The facts here disclose that the partners had reached a decision in early 1961 to dispose of their holdings near Modesto. Bernard had expressed his intention of moving to the coast and Rezendes sought other property in which to invest. Both partners intended to cease farming operations in the Modesto area and, in accordance with this resolution, never discussed an exchange of properties for the purpose of continuing the partnership's business. In an effort to effectuate their decision, the partners initially granted an exclusive listing to Snyder. Later an open listing agreement was executed and Tract A was listed for sale in several advertisements appearing *107 in the Modesto papers. When the partners were approached with the Duftons' exchange proposition and were informed that Snyder had located a prospective purchaser for Tract C, they decided that such avenue would be the most feasible method of effectuating their primary purpose of liquidating their holdings near Modesto. Against this background, it is our view that the partners did not intend Tract C to be a "continuation of the old investment still unliquidated." This view is supported by Snyder's testimony on cross-examination. When Snyder informed the partners that a prospective purchaser had been located, he further assured them that it would not be difficult to sell Tract C. Snyder was able to make such a statement because Tract C was located just outside of the Modesto city limits and was considered to be prime subdivision property. The growth of Modesto toward Tract C was one of the reasons why the Duftons wanted to locate their farming operation elsewhere. In view of its subdivision possibilities, Tract C was a more desirable parcel than Tract A since it could be sold quicker. The partners signified their intention to acquire Tract C only for the purpose of selling it immediately *108 by requesting the insertion of the contingency provision in both the first and second agreements of exchange. The provision provided that the exchange would not be consummated unless Tract C was sold to a third party by the partners as part of the same transaction. The partners never intended to hold Tract C to be used in their business or as an investment. The purpose of the acquisition was simply to provide a vehicle by which the partners could accomplish their stated primary purpose of complete liquidation. When it was known that the prospective purchaser of Tract C was not able to finance the acquisition, the partners could have withdrawn from the exchange agreement. But instead they decided to proceed because they were aware that the possibilities of realizing an immediate sale were far greater for Tract C than Tract A. The partners again asked for and received assurances from Snyder that a purchaser could be found without too much difficulty and in a very short period of time since they neither intended nor wanted to hold Tract C for any other purpose than its sale. Furthermore, since Snyder agreed to defer receipt of his commission until Tract C was sold, the partners realized *109 that the exchange would improve their liquidating position with no immediate cash outlay. Petitioners assert, however, that Tract C was acquired for the purpose of continuing their farming activities. If Tract C had been acquired for that purpose then why did petitioners consent to receiving a parcel smaller than the one given up? Why would they consider accepting a parcel that would be ripe for subdividing in the immediate future? Why would they exchange land that had suited the partnership's particular farming operations for 13 years for other property that had not been shown to accommodate those operations? Why did they agree to transfer farming machinery to the Duftons in the exchange which effectively left the partnership without sufficient equipment with which to conduct a farming operation on an area of more than 41 acres (Tract B)? Why would they dispose of a parcel that was conveniently located to Tract B for one that was 12 miles away? The obvious answer to each of these questions is that Tract C had no farming potential. It was primarily suited for subdividing, and the petitioners were cognizant of that fact. Moreover, it is significant that Snyder was willing to defer *110 receipt of his commission until a purchaser could be found. Surely Snyder would not have agreed to such a proposition if the partners intended to do anything with the parcel other than sell it. In fact, when the contingency provision was removed from the agreement, the partners instructed Snyder to continue searching for a purchaser for Tract C. We think it is clear that the partners' primary purpose for acquiring the property was not to use it in their trade or business or for an investment. Their primary purpose, if not their only purpose, for acquiring Tract C was to sell it. Therefore, we do not regard Tract C as being a "continuation of the old investment." See Regals Realty Co. v. Commissioner, supra. While the partners continued to cultivate some of the crops that had previously grown on Tract C during the period it was held, it is evident that they undertook very little in addition thereto. Rezendes testified to the minimal amount of gross farming income from Tract C after November 1, 1961. He admitted that during the period Tracts B and C were being cultivated their intention was to "liquidate everything if we could." We are satisfied that, even though such *111 farming activity may have constituted a business for certain tax purposes, it did not achieve a status sufficient to satisfy the "primarily" element of the statute. For the extremely short period that Tract C was held, and at the time it was sold to Kirkpatrick, it was held by the partnership primarily for sale. The only reason the partners agreed to the exchange and completed the transaction was to effectuate the primary purpose of disposing of their interests. Petitioners have attempted to eliminate Tract C from consideration by asserting that it "was not held primarily for sale because, so far as petitioners were concerned, the tract was sold at the time the exchange was completed." This may have been the result the petitioners desired, but the fact remains that Tract C was not sold on November 1, 1961. The evidence shows that Bernard moved his residence from Tract A to Tract C upon the completion of the exchange. Certainly this would not have been done if Tract C had been considered sold as of that date. In addition, Snyder testified that he actively pursued prospective purchasers after November 1, 1961. It is axiomatic that *112 questions of taxation are determined by viewing what was actually done rather than the declared purpose or hoped for results of the participants. Weiss v. Stearn, 265 U.S. 242 (1924); and John M. Rogers, 44 T.C. 126, 136 (1965), affirmed per curiam 377 F. 2d 534 (C.A. 9, 1967). Although petitioners claim that Tract C is "like kind" property, the absence of a similar claim with respect to Tract A is not surprising. No evidence has been offered that shows Tract A was not held primarily for sale. Indeed, petitioners have admitted that it was so held during 1961. The change of purpose doctrine enunciated in Mauldin v. Commissioner, 195 F. 2d 714 (C.A. 10, 1952), is therefore applicable. Recognizing this defect, the petitioners have advanced on brief a new and entirely different basis to support their position that the exchange should not be considered a taxable event. Basically, they attempt to disregard the exchange and treat the amounts received from the sale of Tract C as if they resulted from the sale of Tract A. They argue that the exchange and later sale constituted but one transaction. This is contrary to the allegations *113 contained in paragraph 5(d) of each of the petitions filed with this Court, wherein it is alleged that "[Such] transaction [the sale] was independent of and unrelated to the prior transfer and exchange of lands by such partnership." Moreover, when the merits of this argument are examined, its defect also appears. Petitioners ask that the substance of the transaction prevail over its form. But what they fail to recognize is that in this case the substance and form do not differ. As we see it, the record discloses two independent transactions: (1) the exchange between petitioners and the Duftons and (2) the sale by the petitioners to Kirkpatrick. Granted that the petitioners intended to acquire Tract C only on the condition that it would be sold to a third party as part of the same transaction, the exchange was finally consummated absent that sale. After it was learned that Mineni, the prospective purchaser, was not able to obtain financing, they recognized that their desired interdependent transaction was not feasible. But since Tract C was more readily salable than Tract A, they decided that the exchange should be completed and that Tract C should be placed on the market for *114 sale. It is therefore apparent that they intended to acquire Tract C and, when that was accomplished, they immediately offered it for sale in an independent transaction. Petitioners admit, and the facts show, that Tract C was not sold until after they had taken possession. Nevertheless they seek to indulge in the belief that the acreage was sold at the time the exchange was effected. A different result might very well be in order if their version coincided with the facts. But it does not and their argument that the exchange and sale constituted but one transaction cannot prevail. On these facts the short period during which Tract C was held does not affect the independence of the exchange and sale. Petitioners have cited several cases which have applied the "substance versus form" doctrine. The question presented in most of those cases was whether an exchange could be found from the facts. Here, since all parties agree that an exchange was consummated, we think the cited cases are not controlling in this particular factual situation. In any event, such cases hold that "interdependence" of the steps in the transaction is necessary before the several steps are disregarded. It is *115 plain from the facts here that "interdependence" does not exist. Not only was the contingency clause in the Dufton exchange agreement stricken, but Kirkpatrick was neither a party to that agreement nor involved in any of the negotiations. Independence in fact is demonstrated by petitioners' activities with respect to Tract C after the exchange. Consequently, the exchange cannot be ignored. Accordingly, we hold that the petitioners are not entitled to utilize the provisions of section 1031(a) to defer the recognition of gain realized on the exchange. Respondent did not err. To reflect the concessions of the parties on other issues and the conclusion reached herein on the disputed issue, Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. Seven installments, $1,066.66 each.↩
2. SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT. (a) Nonrecognition of Gain or Loss from Exchanges Solely in Kind. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩